THE STATE OF OHIO, APPELLEE, *v.* BRINKLEY, APPELLANT.

[Cite as *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507.]

(No. 2002–2032—Submitted January 11, 2005—Decided April 13, 2005.)

O'CONNOR, J.

{¶ 1} On November 6, 1999, Grady "Snoop" Brinkley, defendant-appellant, robbed Rick's City Diner in Toledo, and police pursued and arrested him that same afternoon. On December 17, 1999, Brinkley's girlfriend, Shantae Smith, posted bond for him, and he was released from pretrial confinement. On January 7, 2000, Brinkley killed Smith in her apartment by cutting her throat. Then he stole her ATM card and winter coat and fled to Chicago. On January 13, 2000, the FBI arrested Brinkley in Chicago. Thereafter, Brinkley was convicted of the aggravated robbery of the City Diner and the aggravated robbery and aggravated murder of Smith and was sentenced to death.

### City Diner Robbery

{¶ 2} In November 1999, Brinkley worked at Rick's City Diner on Monroe Street in Toledo. Though scheduled, Brinkley did not report for work on November 6, but he arrived at the diner at 1:00 p.m. and told the staff that he was waiting for the owner. At times, Brinkley waited inside the diner and joked with Marissa Brown, the hostess. At other times, he waited outside with Olivia Hunter, who had driven him to the diner. After the 2:00 p.m. closing time, Brown counted the money in the cash register, placed a bank deposit slip and the day's proceeds, $2,211, into a paper bag, and put the paper bag into her orange purse.

{¶ 3} After Brown got into her car, Brinkley "came up with a [silver] gun and told [Brown] to give him the bag." Brown "thought he was joking" and "slapped the gun out of [her] face." In response, Brinkley "cocked the gun back and then punched [her] and told [her] he wasn't playing, so [she] gave him the bag." Brinkley then demanded her orange purse and car keys and "told [her] to get out of [her] car and run." Hunter confirmed that Brinkley had a small, "silver" handgun with him that day.

{¶ 4} After Hunter and Brinkley drove off, Brown went back into the diner and told the cook, "Snoop robbed us." The cook noticed that Brown's "mouth [was] full of blood" and "she was all scared." Toledo police were called and responded.

{¶ 5} Hunter testified that after Brinkley got back into her car, he told her to drive him to the Greyhound bus station. He then changed his mind and directed Hunter to drive to a house on Junction Street. Once there, Brinkley introduced Hunter to his girlfriend, Shantae Smith, and gave the orange purse to an older man. Then Hunter drove Brinkley to an apartment complex in Toledo. Police later recovered the purse, which contained the City Diner bank-deposit slip, from a trash can behind that Junction Street house.

{¶ 6} After talking with witnesses at the City Diner, police traced Hunter and Brinkley to the Toledo apartment complex and arrested them that afternoon. Police found $800 hidden in Brinkley's sock and recovered $400 from Hunter. However, police never recovered the balance of the City Diner receipts, approximately $1,011.

### Events After the Robbery and Before the Murder

{¶ 7} On December 3, 1999, Brinkley was arraigned on the City Diner robbery charge, and a bond of $20,000 was set. A pretrial hearing was scheduled for January 6, 2000, and Brinkley's trial was scheduled for January 18, 2000. Brinkley was confined in the county jail from November 6 until being released on bond on December 17, 1999.

{¶ 8} Brinkley's 18–year–old girlfriend, Smith, changed her life after Brinkley's arrest. She moved into an apartment on Collingwood, started a new job, and met new co-workers and friends, Lamont Pettaway and Valarie Vasquez. Smith told Vasquez that she wanted to "be free from" Brinkley, and she told Vasquez and Pettaway that she was afraid of Brinkley. Smith became romantically involved with Pettaway; they planned to live together and talked of marriage.

{¶ 9} While in the county jail, Brinkley talked with fellow inmate Samuel Miller about the City Diner robbery. Brinkley told Miller that he had "waited on [Brown] to come out and stuck the pistol in her face and took the money from her." Brinkley told Miller that "the gun was real."

{¶ 10} Brinkley told Miller that Brinkley's girlfriend, Smith, had visited him every week during most of November but less frequently after Thanksgiving. Brinkley also told Miller that Smith "was sleeping with [a co-worker] and riding back and forth to work with him, and she [Smith] wanted to know * * * was [Brinkley] going to do anything to her if she got him out on bond." Brinkley told Miller that "he played along with [Smith] so she can go ahead and pay the bond. * * * [But] when he got out he was going to hit a lick [i.e., get some cash]," and he "wasn't coming back to court * * * on the robbery charge." Instead, he "was going back home, to Chicago." Brinkley also said, "I'm going to kill that bitch [Smith] before I leave town."

{¶ 11} On December 17, 1999, Smith withdrew $2,000 from her Huntington Bank account and arranged with a bail bond company to post a $20,000 bond to secure Brinkley's release. Smith and Brinkley each personally guaranteed payment of $20,000 if Brinkley did not show up for future court appearances. Brinkley was released that day, and after his release, he stayed with Smith at her Collingwood apartment.

{¶ 12} On January 6, 2000, at approximately 12:35 p.m., Smith withdrew $50 from her bank account using her Huntington Bank automatic teller machine (ATM) card. That day, Smith worked her normal shift of 3:00 p.m. until 11:00 p.m. In the early morning of January 7, Pettaway dropped her off at home after work. Smith never arrived at work that afternoon.

{¶ 13} On January 6, 2000, Brinkley did not appear for his pretrial hearing on the City Diner robbery charge, and the trial court issued a capias warrant for Brinkley's arrest. Ameritech business records establish that on January 6 and 7, several telephone calls were made from Smith's home telephone to the Greyhound bus terminal, and on January 7, a call was made to the Huntington Bank. Also on January 7, a call was placed from the Chicago residence of Brinkley's mother to Smith's telephone number.

{¶ 14} Huntington Bank records show that on January 7, 2000, someone tried 16 times to use Smith's Huntington ATM card in various ATMs to access her bank funds. These attempts failed because no valid personal identification number (PIN) was entered.

{¶ 15} Nine of these attempts to use Smith's ATM card occurred between 3:37 p.m. and 3:42 p.m. at the Madison Avenue ATM that Smith herself had successfully used the previous day. Photographs taken at the ATM do not fully reveal the face of the person who tried to withdraw funds. A Huntington Bank investigator explained that the ATM cameras, set for users of average height, did not capture the user's face because the user was too tall. Brinkley is six feet, four inches tall. The photos do depict a male wearing a winter coat identical to a coat that Smith owned. Smith's blue winter coat was later recovered from Brinkley in Chicago.

{¶ 16} According to Greyhound Bus Company business records, a prepaid ticket was purchased in Chicago at 3:29 p.m., CST, on January 7, 2000, and electronically forwarded for pickup in Toledo. The password needed to pick up the ticket was Alberta, the name of Brinkley's mother. The ticket was issued for a Grady Brinkley to travel to Chicago and was in fact used to travel on the 6:50 p.m. bus from Toledo to Chicago that night. Bus terminal surveillance video depicts Brinkley in the terminal at 6:29 p.m., when the ticket was claimed. A Greyhound manager identified Brinkley as the person who had claimed the ticket. Huntington Bank records revealed that two unsuccessful attempts to use Smith's

ATM card occurred at 6:33 p.m. and 6:34 p.m. on January 7 at the bus terminal ATM.

{¶ 17} After 7:00 p.m. on January 8, 2000, Smith's mother forced her way into her daughter's locked apartment through a back door, found her daughter's body, and called police. Deputy Coroner Dr. Diane Scala–Barnett concluded that at the time Smith's mother found her, Smith had been dead for more than 30 hours. The killer had attempted to strangle Smith, rendering her unconscious, and had then cut her throat, killing her.

{¶ 18} Smith's body rested on a quilt, and police discovered at least four partial shoeprints in blood on the quilt. DNA from blood on the quilt exactly matched Smith's DNA. Brinkley's Nike tennis shoes were later recovered in Chicago. Ted Manasian, a forensic scientist for Ohio's Bureau of Identification and Investigation ("BCI"), compared Brinkley's tennis shoes with the bloody shoeprints. The patterns on Brinkley's shoes were identical to those in the bloody shoeprints, and Manasian could not "find any differences that would allow [him] to eliminate [Brinkley's] shoe" as having made the shoeprints.

{¶ 19} On a shelf near the kitchen, police found a handwritten note to the landlord, worded as follows: "Will be gone to Atlanta for 7 days to see my friend, could you please not come fix my sink until I come back." The note was dated "1–7–99 [sic]," and was signed with Smith's name. However, the handwriting on the note, including the purported signature, appears to be Brinkley's. Moreover, police found Brinkley's left thumbprint on the note. No other evidence suggests that Smith had planned to go to Atlanta.

{¶ 20} Police determined that the last person in the apartment before Smith's mother broke in had left through the locked front door. The apartment's back door had been locked from the inside with a security chain, and the front door had been locked from the outside with a key.

{¶ 21} On January 13, 2000, members of a fugitive task force arrested Brinkley at his mother's Chicago residence. When Brinkley was arrested, the weather was cold, and Brinkley put on a winter coat and a pair of size 15 Nike tennis shoes to walk to the FBI car. The coat looked odd on Brinkley because it was too small for his six-feet-four-inch frame. Witnesses verified that this coat belonged to Smith. Smith had been wearing that coat when she withdrew ATM funds on January 6. The person who tried to use her ATM card on January 7 had worn an identical coat.

{¶ 22} When FBI Special Agent David Browne placed Brinkley into his car, he advised him of his *Miranda* rights but told him, "I would prefer if you didn't talk." Nevertheless, Brinkley began to talk. Brinkley said he doubted that "the FBI would have come and got him for a robbery." Brinkley asked whether Ohio was a death-penalty state, and Browne told him he did not know but would check.

According to Browne, Brinkley then said "that he was willing to confess * * *, but he needed to talk to his mother to find out whether or not Ohio was a death penalty state." Browne then allowed Brinkley to call his mother on Browne's cell phone. According to Browne, Brinkley also said that he "didn't think that it was right to make the State of Ohio pay 30 thousand dollars a year to keep him alive and that he wanted to get this all over with."

{¶ 23} At the police station, Browne again allowed Brinkley to call his mother. After he did so, Brinkley told Browne that "he was not going to make a confession, but he would talk to [Browne] if [he] had some questions to ask." Browne again advised Brinkley of his *Miranda* rights. Brinkley then waived his rights and agreed to talk with Browne. Brinkley said that he had thrown away his key to Smith's apartment. He admitted that the Nike tennis shoes he was wearing were his and claimed that Smith had given him her winter coat, a blue down jacket. While at the station, Brinkley also "[s]aid he was going to kill [Browne]" and "could do [Browne] like he had done other people."

### Charges and Trial

{¶ 24} In October 2000, a grand jury reindicted Brinkley, thereby consolidating pending charges, including robbery, aggravated robbery, and aggravated murder. The new indictment included death-penalty specifications alleging murder in the course of an aggravated robbery, R.C. 2929.04(A)(7), and murder to escape detection, arrest, or punishment for another offense, R.C. 2929.04(A)(3). The jury convicted Brinkley as charged, and the trial court imposed the death sentence. The chart below reflects the offenses charged, the jury's findings, and the sentences imposed.

| Charge | Verdict | Jury Recommendation | Sentence |
|---|---|---|---|
| 1. Agg. robbery of City Diner on 11/6/99 with firearm specification. | Guilty | | 10 years plus 3 years for firearm specification. |
| 2. Robbery of City Diner. | Guilty | | Merged with Count 1. |
| 3. Agg. murder of Smith with prior calculation and design. Charge included R.C. 2929.04(A)(7) and (A)(3) specifications. | Guilty | Death | Death |
| 4. Agg. felony murder of Smith with R.C. 2929.04(A)(7) and (A)(3) specifications. | Guilty | | Merged with Count 3. |
| 5. Agg. robbery of Smith. | Guilty | | 10 years |

{¶ 25} In his direct appeal to our court, Brinkley presents 24 propositions of law. We find no merit in any of his propositions of law. Hence, we affirm the findings of guilt. We have also independently weighed the aggravating circumstances against the mitigating factors and have considered the appropriateness of the death sentence. For the reasons that follow, we affirm the judgment of the trial court, including the death sentence.

### Relationship Between City Diner Robbery and the Murder Charges

{¶ 26} In propositions of law I, II, III, and XII, which are interrelated, Brinkley raises issues concerning the connection between the City Diner robbery and the murder and robbery of Shantae Smith.

{¶ 27} *Joinder of offenses.* In proposition of law II, Brinkley argues that he is entitled to a new trial because the prosecutor, acting in bad faith, improperly joined for trial the City Diner robbery charges with charges relating to the aggravated robbery and murder of Smith. Brinkley also complains because the prosecutor included a R.C. 2929.04(A)(3) death-penalty specification (murder to escape trial or punishment for another offense) in that aggravated-murder charge.

{¶ 28} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple criminal offenses in a single trial under Crim.R. 8(A)." *State v. Franklin* (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293. See, also, *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288.

{¶ 29} Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder," a trial court may grant a severance. Crim.R. 14. The defendant, however, bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance. *Torres*, 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

{¶ 30} As we noted in *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293, "[a] prosecutor can use two methods to negate such [defense] claims of prejudice." First, if one offense could have been introduced under Evid.R. 404(B) at the trial of the other offense, no prejudice could have resulted from joinder. Evid.R. 404(B) recognizes that evidence of other crimes may "be admissible for * * * proof of motive, opportunity, intent, preparation, plan." Second, the state can refute prejudice by showing "that evidence of each of the crimes joined at trial is simple and direct." *Franklin*, 62 Ohio St.3d at 122, 580 N.E.2d 1.

{¶ 31} Here, the trial court did not abuse its discretion by rejecting Brinkley's motion to dismiss the R.C. 2929.04(A)(3) specification or to sever the charges relating to the aggravated robbery of the City Diner. For several reasons, we conclude that Brinkley's claims of bad faith and improper joinder lack merit.

{¶ 32} First, the prosecution properly introduced evidence of the City Diner robbery to prove the R.C. 2929.04(A)(3) death-penalty specification included in the aggravated-murder charges relating to Smith. That specification charged Brinkley with killing Smith in order to escape "apprehension, trial, or punishment for another offense committed by the offender." The other "offense" in question was the City Diner robbery, and thus robbery of the City Diner was a crucial element of the R.C. 2929.04(A)(3) specification.

{¶ 33} Second, the diner robbery and the offenses against Smith could be tried together because they were "connected together" and constituted parts of a "course of criminal conduct." Crim.R. 8(A). The evidence firmly established that Brinkley had intended to escape trial and punishment for the City Diner robbery. Smith posted bail at Brinkley's direction. Then, Brinkley did not show up for his pretrial court hearing on January 6 but instead fled to Chicago on January 7. His murder of Smith occurred on January 7 after he failed to appear in court for his pretrial but before he fled to Chicago. Thus, the jury could reasonably infer that Brinkley murdered and robbed Smith to facilitate his flight from prosecution for the City Diner robbery.

{¶ 34} Third, the evidence relating to the City Diner robbery was properly admissible under Evid.R. 404(B) as "other acts" evidence to help prove that Brinkley killed and robbed Smith. As permitted by Evid.R. 404(B), that robbery evidence helped to prove Brinkley's motive, his intent, his preparation, and his plan as to the Smith offenses. Shortly after robbing the City Diner, Brinkley directed Hunter to drive to Smith and introduced Hunter to Smith. Police arrested Hunter and Brinkley within an hour or so of the robbery. Although police quickly arrested Hunter and Brinkley, police recovered only $1,200 from them, even though Brinkley had stolen over $2,200 in the City Diner robbery. On these facts, the jury could reasonably infer that Smith, who was Brinkley's girlfriend, was holding money for Brinkley and later used this money on December 17 to arrange Brinkley's release on bond.

{¶ 35} Moreover, after Brinkley persuaded Smith to post bail, Smith became personally liable, in the sum of $20,000, for Brinkley's later court appearances. Thus, Smith represented a risk to Brinkley. Smith knew about Brinkley's mother because Smith had visited her home in Chicago, and Smith would have known where Brinkley planned to go when he fled Toledo. The jury could have reasonably concluded that Brinkley killed Smith in part so that she could not help authorities or the bail bondsman locate Brinkley after he jumped bail.

{¶ 36} Further, in making his escape to Chicago to avoid his upcoming trial, Brinkley stole Smith's coat and bank ATM card when he killed her. Thus, the City Diner robbery and the aggravated murder and robbery of Smith were related. The admissibility of such "other acts" evidence negated any claims of prejudice that Brinkley makes as to the joinder. See *Torres*, 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus; *Franklin*, 62 Ohio St.3d at 122, 580 N.E.2d 1.

{¶ 37} Finally, we have recognized that when simple and direct evidence exists, an accused is not prejudiced by joinder. *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. See, e.g., *State v. Johnson* (2000), 88 Ohio St.3d 95, 109, 723 N.E.2d 1054; *Franklin*, 62 Ohio St.3d at 122, 580 N.E.2d 1. In Brinkley's case, the proof of each offense was separate and distinct and unlikely to confuse jurors. To prove the City Diner robbery, the testimony of the victim, Marissa Brown, and Brinkley's accomplice, Hunter, was simple, direct, and compelling. Although evidence proving the murder was more complex, the jury would not have been confused about what evidence proved the City Diner robbery and what evidence proved the aggravated robbery and murder of Smith.

{¶ 38} In sum, the Smith and City Diner offenses were properly joined, and the state properly introduced evidence of the City Diner robbery to prove the R.C. 2929.04(A)(3) death-penalty specification. The offenses were interconnected and constituted a course of criminal conduct. Claims of prejudice were negated by the admissibility of the City Diner robbery as "other acts" evidence and the fact that proof of the City Diner robbery was unlikely to confuse jurors. We reject Brinkley's proposition of law II.

{¶ 39} **Sufficiency of evidence to prove murder to escape trial.** In proposition of law I, Brinkley argues that the trial court erred in rejecting a Crim.R. 29 motion for acquittal as to the R.C. 2929.04(A)(3) specification. Essentially, Brinkley challenges the sufficiency of evidence to prove that he killed Smith "for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender." Id.

{¶ 40} In a review for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The weight to be given the evidence and the credibility of witnesses are primarily jury issues. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 41} In this case, we find that the evidence was sufficient to establish Smith's guilt of the R.C. 2929.04(A)(3) specification beyond a reasonable doubt. First, the evidence firmly established that Brinkley fled Toledo to avoid trial and punishment for the City Diner armed robbery. Brinkley did not appear at his court hearing on January 6. Instead, he fled to Chicago on January 7, after he had killed Smith. His flight to Chicago was clearly made for the purpose of avoiding trial and punishment for the City Diner robbery.

{¶ 42} Second, the jury could reasonably conclude that Brinkley killed Smith, at least in part "for the purpose of escaping * * * trial, or punishment" for the City Diner robbery. Brinkley's contention that if he killed Smith, he did so only because she had fallen in love with someone else does not fit the facts. After his release on December 17, Brinkley stayed with Smith for over two weeks. But by January 7, he had skipped his pretrial hearing on the City Diner robbery, and he needed funds to escape to Chicago. On January 7, the day he killed Smith, Brinkley attempted 16 times to use Smith's ATM card to obtain those funds.

{¶ 43} Under these facts, a jury could reasonably conclude that Brinkley killed Smith, at least in part to steal her coat and ATM card to facilitate his escape from trial and punishment for the City Diner robbery. Also, Smith posed a risk to Brinkley because Smith was personally liable for Brinkley's bond. Hence, Smith had a strong incentive to tell authorities or the bail bondsman about Brinkley's plans to flee to Chicago. We find that the evidence supports the jury's finding of guilt as to the R.C. 2929.04(A)(3) specification, and we reject proposition of law I.

{¶ 44} *Sufficiency of evidence to prove identity.* In proposition of law XII, Brinkley challenges the sufficiency of the evidence to establish his identity as the person who murdered and robbed Smith. But "[t]he relevant inquiry [in a review for sufficiency] is whether * * * any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 45} In this case, the state proved through a plethora of evidence that Brinkley was the individual who murdered Smith and stole her coat and ATM bank card.

{¶ 46} A. After Smith posted bond for Brinkley on December 17, Brinkley stayed at Smith's apartment. On January 7, 2000, the day of Smith's murder, Ameritech business records show phone calls from Smith's apartment to the Greyhound bus terminal and a call from Brinkley's mother's home in Chicago to Smith's apartment.

{¶ 47} B. At the murder scene, police found bloody shoeprints on the quilt on which Smith's body lay. The shoeprints exactly matched the patterns on

Brinkley's Nike tennis shoes, and Brinkley wore these shoes when he was arrested in Chicago.

{¶ 48} C. At the murder scene, police found a handwritten note falsely advising the landlord that Smith planned to go to Atlanta for seven days. Brinkley's thumbprint was on that note, and the handwriting appeared to be Brinkley's.

{¶ 49} D. Brinkley was living with Smith at the time of her death. Whoever killed Smith had a key to her apartment. Brinkley admitted he had had a key and that he had thrown it away in Chicago because he no longer needed it.

{¶ 50} E. ATM photographs at the Greyhound bus station establish that on the day Smith was killed, Brinkley tried to use Smith's ATM card. Other ATM photographs and records establish that on the day Smith was killed, someone wearing a coat identical to hers made multiple attempts to gain access to her Huntington Bank account. When Brinkley was arrested in Chicago, he had Smith's coat.

{¶ 51} F. On January 7, 2000, the day Smith was killed, Brinkley left Toledo at 6:50 p.m. on a Greyhound bus to Chicago. The ticket he used had been purchased in Chicago for travel that evening from Toledo to Chicago.

{¶ 52} G. At the time of his arrest, Brinkley told FBI Agent Browne "that he was willing to confess" but needed to find out whether "Ohio was a death penalty state." He also told Browne that "he was going to kill [Browne]" just "like he had done other people."

{¶ 53} In sum, compelling evidence established that Brinkley purposefully killed Smith and robbed her of her coat and ATM card. Under the *Jenks* test, a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. We reject proposition XII.

{¶ 54} ***Requirement for new penalty hearing.*** In proposition of law III, Brinkley argues that we must order a new penalty hearing because the evidence did not prove his guilt of the R.C. 2929.04(A)(3) specification. Further, Brinkley argues that we cannot affirm the death penalty on the remaining (A)(7) death-penalty specification.

{¶ 55} We reject proposition III, however, because we find that the evidence supported the jury's verdict that Brinkley killed Smith to escape trial and punishment for another offense, namely the City Diner robbery. Thus, the state proved all the elements of the R.C. 2929.04(A)(3) death-penalty specification beyond a reasonable doubt.

## Pretrial Issues

{¶ 56} *Suppression of accused's pretrial statements.* In proposition of law IV, Brinkley argues that the trial court erred when it denied his pretrial motion to suppress certain oral statements that he made to FBI Agent Browne in Chicago after his arrest. Brinkley argues that while the FBI agents "attempted to determine if Mr. Brinkley" was "under the influence of drugs or alcohol, they did not make a similar determination [whether] Mr. Brinkley was sleep deprived or groggy from the early morning arrest." But Brinkley cites no facts other than the early morning hour of his arrest to support his claims.

{¶ 57} A trial court, in determining whether a pretrial statement is involuntary, "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. See, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491. The same considerations apply to whether Brinkley understood and voluntarily waived his *Miranda* rights. See *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208; *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640.

{¶ 58} We find that the record supports the trial court's conclusion that Brinkley "was properly advised of his [*Miranda*] rights, and knowingly, intelligently and voluntarily waived those rights by answering questions," and that his pretrial statements to the FBI were voluntary. As we held in *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583, "the weight of the evidence and credibility of witnesses are primarily for the trier of the facts. * * * This principle is applicable to suppression hearings as well as trials." Accord *DeHass*, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542; *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

{¶ 59} Given the sequence of events, the evidence does not support the claim that Brinkley was still groggy or sleepy when he waived his rights or made incriminating statements. Before law enforcement officers entered the Chicago apartment of Brinkley's mother, they called twice. During those calls, which began at 6:00 a.m., the FBI told the occupants that officers were there and were not going away. Then, police knocked and spent several minutes trying to persuade Brinkley's mother to open the door, which she finally did after police threatened to force it open. The officers were admitted to the apartment at 6:30 a.m.

{¶ 60} When members of the fugitive task force entered the apartment, they arrested Brinkley, who was sitting at a table. Brinkley was coherent and did not

appear intoxicated. Brinkley's mother and sister were screaming and yelling, and his sister tried to obstruct the arrest. Brinkley attempted to calm them down. After his arrest, Brinkley put on his shoes and coat, was handcuffed, walked out of the building, and got into an FBI car.

{¶ 61} At 6:35 a.m., after Brinkley was in the FBI car, Agent Browne fully advised Brinkley of his *Miranda* rights. Browne also told Brinkley that he preferred that Brinkley not talk. Brinkley acknowledged that he understood his rights. Although Brinkley was not questioned, Brinkley commented that he was willing to confess but asked to call his mother first. Brinkley talked to his mother on the phone for five minutes. After he was booked at the station, Browne again advised Brinkley of his *Miranda* rights around 7:30 a.m. Brinkley acknowledged and waived those rights. Then Brinkley stated that he had decided not to confess but was willing to answer questions, and did so. Brinkley never stated that he was tired or that he did not want to talk with the FBI.

{¶ 62} We find that the FBI never threatened or intimidated Brinkley and did not coerce his informed decision to waive his *Miranda* rights. Further, we find no basis to sustain Brinkley's claim that his statements were inadmissible because he was too sleepy to understand or waive his rights. Brinkley voluntarily waived his *Miranda* rights, and his statements to the FBI were voluntary. We reject proposition of law IV.

{¶ 63} *Jury selection: phrasing of voir dire questions.* In proposition of law V, Brinkley argues the trial court erred in advising prospective jurors during voir dire that "if the law requires a death sentence they must vote to impose death as a sentence but if the law requires a life sentence they must *consider* voting for" a life sentence. (Emphasis added.) However, this argument has no merit.

{¶ 64} First, Brinkley never objected at trial to the phrasing of these voir dire questions, and he thereby waived the issue save plain error. *Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. See, e.g., *State v. Stallings* (2000), 89 Ohio St.3d 280, 285, 731 N.E.2d 159 (failure to object to trial court's misstatements during voir dire waived issue).

{¶ 65} Second, no plain error occurred. The trial court's use of the term "consider" referred to all options, including all life sentences. The trial court never suggested that the jury need not vote for life if the jury found the death sentence inappropriate. Brinkley quotes only part of the voir dire of Juror 62 to sustain his argument. But the following expanded extract of that voir dire demonstrates its fairness.

{¶ 66} "THE COURT: [If the defendant is found guilty of the charges and specifications] then the jury is going to be *asked to consider what the penalty should be.*

{¶ 67} "There are four possibilities. One possibility is life imprisonment without parole. The second possibility is life imprisonment with parole eligibility after 30 full years of prison. Third possibility, life in prison with parole after 25 full years, and the final possibility is penalty of death.

{¶ 68} [Discussion of presumption of innocence, juror availability, media exposure omitted.]

{¶ 69} "THE COURT: Are you religiously, philosophically, morally or otherwise opposed to the death penalty?

{¶ 70} "PROSPECTIVE JUROR: No.

{¶ 71} "THE COURT: * * * [I]f you were seated as a juror, heard all the evidence, got the instructions of law and you felt after weighing the evidence and applying the law that the death penalty was appropriate, you would vote to impose that penalty?

{¶ 72} "PROSPECTIVE JUROR: Yes.

{¶ 73} "THE COURT: And * * * if * * * after weighing the evidence and hearing the instructions of law you felt *the death penalty was inappropriate, would you consider the other sentencing options of life imprisonment?*

{¶ 74} "PROSPECTIVE JUROR: Yes.

{¶ 75} "THE COURT: * * * [During] the sentencing phase, * * * [after] a verdict of guilty * * * as to aggravated murder and the specification, the question is this. *Would you automatically vote to impose a sentence of death regardless of the facts on the sentencing phase, or would you consider all sentencing options?*

{¶ 76} "PROSPECTIVE JUROR: *Consider all sentencing options.*

{¶ 77} "* * *.

{¶ 78} "MR. DECH [Defense counsel]: * * * [A]t the sentencing phase you'll be hearing mitigating factors which may or may not be related to the offense which was charged. Will you listen to everything and then make your decision?

{¶ 79} "PROSPECTIVE JUROR: Yes.

{¶ 80} "MR. DECH: Okay. And *if it is inappropriate for the death penalty, will you vote in favor of one of the life sentencing options?*

{¶ 81} "PROSPECTIVE JUROR: Yes." (Emphasis added.)

{¶ 82} The trial court and counsel questioned each prospective juror in a similar fashion. The context reveals that the court was simply asking whether an individual juror would fairly consider the choice of one of the life-imprisonment sentences as well as the death sentence. The trial court frequently used the term "consider" to refer to the choice among the three possible life sentences.

{¶ 83} Moreover, the trial court routinely asked whether a prospective juror would automatically vote for the death penalty without considering all sentencing options. The trial court also informed each prospective juror of each sentencing option.

{¶ 84} Third, the ordinary meaning of the term "consider" implies a fair and full deliberation rather than the cursory examination that Brinkley suggests. Webster's Ninth New Collegiate Dictionary (9th Ed.1983) 279 defines "consider" as follows: "1. To think about carefully." Black's Law Dictionary (5th Ed.1979) 277 defines "consider": "To fix the mind on, with a view to careful examination; to examine; to inspect. To deliberate about and ponder over. To entertain or give heed to."

{¶ 85} In sum, Brinkley's complaint of plain error lacks merit. In context, the use of the term "consider" in voir dire was not misleading or improper. Hence, we reject proposition of law V.

{¶ 86} *Jury selection—disqualification of juror.* In proposition of law VI, Brinkley contends that the trial court improperly questioned and excused prospective juror 52 based on the prospective juror's death-penalty views.

{¶ 87} The test for excluding prospective jurors based upon their death-penalty views "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841.

{¶ 88} Brinkley argues that the trial court sustained the state's challenge to prospective juror 52 based on a question "grounded in a few of the facts of the case and based on an inaccurate statement of the law." But the defense counsel never objected to the phrasing. Here, the record demonstrates that the court and counsel fairly voir dired prospective juror 52, and the trial court did not abuse its discretion in excusing the juror.

{¶ 89} Prospective juror 52 noted her religious and philosophical opposition to the death penalty. At first, she asserted that "there is only one person who has that right to take another life. There are so many other alternatives." When asked if she could vote for death, she responded, "[T]o be honest, I can't answer. I don't know."

{¶ 90} At various times, the prospective juror stated that she could vote for the death penalty, but said, "If given a choice I'm not for it." At other times, she stated, "I don't think I could" sign a death verdict. She again reiterated that she could not sign, although she agreed to follow the law as a juror to the best of her ability. When asked yet again whether, if "the law required the death penalty,

[she would] * * * sign [her] name on a verdict form," she answered, "[T]o be honest, I can't imagine anything at this point that would make me * * * go in that direction."

{¶ 91} The court then asked, "If the law said that if another individual took a life of somebody else while committing a felony * * * and the law said * * * the penalty of death is the appropriate penalty, * * * [would that be] the kind of circumstances where you would vote to impose the death penalty?" The prospective juror responded, "I don't believe so." Then she reiterated, "Given what I know now, my answer would be no, that I would not vote for the death penalty." When asked, "Even if the law required it?" she answered, "Even if the law required it." The trial court then concluded that the prospective juror "cannot imagine any set of circumstances" under which she would vote for the death penalty and sustained the state's challenge for cause.

{¶ 92} In view of the juror's answers as to signing a death-penalty verdict, the trial court's decision to sustain the challenge was within its discretion. Cf. *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 391, 721 N.E.2d 52; *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576. A "ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." Id. at 31, 553 N.E.2d 576. Accord *State v. Fears* (1999), 86 Ohio St.3d 329, 337, 715 N.E.2d 136; *State v. McNeill* (1998), 83 Ohio St.3d 438, 445, 700 N.E.2d 596. Clearly, "deference must be paid to the trial judge who sees and hears the juror." *Wainwright*, 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841. See, also, *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915. Hence, we reject proposition VI.

## Guilt–Phase Issues

{¶ 93} *Violation of exclusion order/denial of mistrial.* In proposition of law VII, Brinkley argues that the trial court erred when it denied his motion for a mistrial. Brinkley bases this claim on the following events.

{¶ 94} At a conference during trial, the trial court declared that it would admit evidence "that Shantae Smith had fear and apprehension of Grady Brinkley" but ordered that witnesses could not testify about why she had felt those fears. The trial court's ruling was correct. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 74 (evidence that a victim had a fearful state of mind was admissible as a hearsay exception under Evid.R. 803[3] but not "the reasons or basis behind the victim's fearful state of mind"). Accord *State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000; *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21–22, 514 N.E.2d 394.

{¶ 95} At trial, Pettaway testified that he dropped Smith off at her apartment after work on January 7 after midnight. Then Assistant Prosecuting Attorney Timothy Braun inquired as follows:

{¶ 96} "Q. Did you go inside?

{¶ 97} "A. No, she wouldn't let me in.

{¶ 98} "Q. Why not?

{¶ 99} "A. Because he was home.

{¶ 100} "MR. THEBES [Defense counsel]: Objection.

{¶ 101} "THE COURT: Sustained."

{¶ 102} Brinkley's counsel then moved for a mistrial, declaring that this quoted testimony makes "an inference that is extremely prejudicial." But we hold that Brinkley's claim of error has no merit.

{¶ 103} First, the trial court sustained the objection, and Brinkley never requested that the jury be given a cautionary instruction to disregard the testimony.

{¶ 104} Second, the statement that Brinkley was home did not reasonably relate to Smith's fear. Instead, the most likely inference was simply that Smith felt that inviting Pettaway inside would be awkward because Brinkley was there. Moreover, at trial, the prosecutor recognized that Pettaway was "somebody who * * * was avoiding [Brinkley.] * * * [H]e was trying to avoid any confrontations." The fact that Smith never expressed any reluctance to go inside demonstrates that her fear was never implicated in Pettaway's testimony.

{¶ 105} Third, even if the jury might have interpreted this testimony to imply that Smith was afraid of Brinkley, the testimony never related to the *reasons* for Smith's fear, the only category of evidence restricted by the trial court. Thus, we reject Brinkley's claim that this testimony violated "a rigid court order." Mistrials are necessary "only when the ends of justice so require and a fair trial is no longer possible." *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623. Pettaway's testimony did not deny Brinkley a fair trial. Therefore, we overrule proposition of law VII.

{¶ 106} ***Limits on cross-examination.*** In proposition of law VIII, Brinkley argues that the trial court unfairly limited cross-examination of a jailhouse informant "designed to demonstrate" that the witness's testimony was given "with the hope or expectation of substantial gain."

{¶ 107} At trial, informant Samuel Miller testified about his conversations with Brinkley between November 6 and December 17, 1999, when they were confined together in the county jail. On January 10, 2000, after he learned of Smith's murder, Miller told the police about these conversations. In January 2000, Miller

was convicted on a charge of escape from parole and was sentenced to community control for that offense.

{¶ 108} At trial, Brinkley wanted to cross-examine Miller to suggest that Miller had received a deal and a favorable sentence in 2000 because he informed on Brinkley. But the trial court ruled, "Absent some reasonable basis to believe the State has granted or had anything to do with this [sentence of] community control, the Court is going to deny inquiry with respect to that." In fact, the attorney who prosecuted Miller in January 2000 verified that neither he nor the sentencing court knew about Miller's conversations with the police as to what Brinkley had told Miller. Hence, that assistance had no effect on Miller's sentencing in 2000.

{¶ 109} Under these circumstances, Brinkley has not established that the trial court abused its discretion. "Cross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" *State v. Green* (1993), 66 Ohio St.3d 141, 147, 609 N.E.2d 1253, quoting *Alford v. United States* (1931), 282 U.S. 687, 691, 51 S.Ct. 218, 75 L.Ed. 624. Accord *State v. Woodard* (1993), 68 Ohio St.3d 70, 74, 623 N.E.2d 75 (upheld limits on cross-examination of co-accused). Moreover, Evid.R. 607(B) specifies that "[a] questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." See, also, *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, paragraph two of the syllabus ("A cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists").

{¶ 110} Here, the trial court did not unfairly limit cross-examination, because no good-faith basis existed to cross-examine Miller about a nonexistent January 2000 deal. When Miller talked with police, Brinkley's trial was more than two and one-half years away, and the state had not yet begun assembling its witnesses. The prosecutor and the judge involved in Miller's prosecution knew nothing of Miller's conversations with the police about Brinkley.

{¶ 111} Moreover, the jury had all the information it needed to assess Miller's credibility, and the defense cross-examination was not otherwise restricted. The jury knew of Miller's previous convictions. The jury also knew that, in exchange for his truthful testimony against Brinkley, the state had agreed that Miller would be held in the county jail pending his release on parole instead of in a state prison. Accord *State v. Robb* (2000), 88 Ohio St.3d 59, 71, 723 N.E.2d 1019. Accordingly, we reject proposition VIII.

{¶ 112} *Failure to qualify witness as expert.* In proposition of law IX, Brinkley argues that the trial court erred when it permitted Dr. Diane Scala–Barnett, who had performed the autopsy on Smith, to testify as an expert as to

the cause of Smith's death. At trial, the state did not formally tender Dr. Scala–Barnett as an expert witness, but Brinkley never objected to her testimony or qualifications. Thus, Brinkley waived all but plain error. *State v. Hartman* (2001), 93 Ohio St.3d 274, 286, 754 N.E.2d 1150; *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 113} Brinkley's claims of plain error lack merit. At trial, Dr. Scala–Barnett testified that she was a physician, had served a four-year residency in pathology, had one year of subspecialty training in forensic pathology, and had been board-certified in forensic pathology since 1986. Moreover, as a part of her duties, she had performed almost 6,000 autopsies.

{¶ 114} Under Evid.R. 702(B), Dr. Scala–Barnett was "qualified as an expert by specialized knowledge, skill, experience, training, or education" to testify as a forensic pathologist as to the cause of death and how long Smith lived after receiving the fatal wound. Given her qualifications, the state's failure to tender her as an expert was of no consequence and did not create plain error. See *Hartman*, 93 Ohio St.3d at 286, 754 N.E.2d 1150.

{¶ 115} In fact, we recognized in *Baston*, 85 Ohio St.3d at 423, 709 N.E.2d 128, that Dr. Scala–Barnett's "experience as a deputy coroner and her board certifications in pathology and forensic pathology qualify her to testify regarding the cause of death." In *Baston*, we also held that the state's failure to formally tender Dr. Scala–Barnett as an expert did not create plain error. Id. Hence, we reject proposition IX as waived.

{¶ 116} *Absence of accused at legal conferences.* In proposition of law XI, Brinkley argues that the trial court's failure to secure his personal presence or obtain a waiver of his presence during certain trial conferences violated his constitutional rights to confrontation and due process.

{¶ 117} An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only.*" (Emphasis added.) *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674.

{¶ 118} In *United States v. Gagnon* (1985), 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486, the Supreme Court held that under certain circumstances, a defendant's absence from a hearing at which his counsel are present does not offend due process. In *Kentucky v. Stincer* (1987), 482 U.S. 730, 746, 107 S.Ct. 2658, 96 L.Ed.2d 631, the court found no due-process or Confrontation Clause violation when an accused was excluded from a hearing on the competency of two child witnesses. See, e.g., *State v. Williams* (1983), 6 Ohio St.3d 281, 285–286, 6

OBR 345, 452 N.E.2d 1323 (absence at hearings can be harmless error); *State v. Roe* (1989), 41 Ohio St.3d 18, 27, 535 N.E.2d 1351. See, also, Fed.R.Crim.P. 43(b)(3) (accused need not be present at "a conference or hearing on a question of law").

{¶ 119} In this case, the record demonstrates that the trial court was acutely aware of Brinkley's right to be present. When the court was about to consider the admission of exhibits, Brinkley stated that he wanted to go back to his cell. Then, the court carefully explained Brinkley's right to be present and obtained from him a voluntary, knowing, and intelligent waiver of that right.

{¶ 120} The record does not support Brinkley's claims that his rights were violated by his absence at other conferences. Prior to the March 21, 2002 conference, Brinkley's counsel privately informed the court that they could no longer represent Brinkley. However, Brinkley was present at the March 21, 2002 conference and agreed that counsel "cannot fully and fairly and effectively represent" him. Brinkley also explained why he wanted to change lawyers, and the court thereafter appointed new attorneys for him.

{¶ 121} Nor do Brinkley's other references to the record establish any violation of his right to be present at critical stages of his trial. At conferences on October 10 and October 12, 2001, counsel discussed with the court Brinkley's complaints about the jail and jail personnel, but these complaints did not involve his trial. One of Brinkley's references to an "off the record discussion" simply involved a decision to voir dire a juror out of the normal order because her bus had been late. The record does not reflect that Brinkley was absent during a brief, unrecorded in-chambers discussion. The court's reference to "at least 2 charge conferences with counsel for both parties on the jury instructions" also did not indicate that Brinkley was absent. Nor does the record establish that Brinkley was absent during unrecorded bench conferences during the trial.

{¶ 122} Even if we were to assume that Brinkley was absent from the unrecorded in-chambers or bench conferences, counsel could have waived his presence. See *United States v. Gagnon*, 470 U.S. at 528, 105 S.Ct. 1482, 84 L.Ed.2d 486 (trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend"); *United States v. Gallego* (C.A.2, 1999), 191 F.3d 156, 171 (waiver can be implied by accused's failure to object to exclusion); *State v. Green*, 90 Ohio St.3d at 371, 738 N.E.2d 1208; *State v. Hill* (1995), 73 Ohio St.3d 433, 444, 653 N.E.2d 271.

{¶ 123} Moreover, at these conferences, the jury never received testimony or evidence, and no critical stage of the trial was involved. Cf. *State v. Taylor* (1997), 78 Ohio St.3d 15, 24, 676 N.E.2d 82. Nor has Brinkley established the content of the discussions. The conferences may well have involved legal or

scheduling issues within the professional competence of counsel. Cf. *United States v. Brown* (C.A.6, 1978), 571 F.2d 980, 987 (accused must establish prejudice from absence at in-chambers conference); *State v. Green*, 90 Ohio St.3d at 371, 738 N.E.2d 1208; *State v. White* (1998), 82 Ohio St.3d 16, 26, 693 N.E.2d 772 (accused's absence during hearing on proposed instructions did not deprive him of fair trial). For these reasons, we reject proposition XI.

### Ineffective Assistance of Counsel

{¶ 124} In propositions of law X, XIV, and XXII, Brinkley raises various claims that his trial counsel provided ineffective assistance and that a new trial is warranted. For Brinkley to obtain reversal based on ineffective assistance of counsel, he must prove (a) deficient performance ("errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment") and (b) prejudice ("errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 125} In proposition X, Brinkley argues that his counsel provided ineffective assistance because counsel failed to object to Dr. Scala–Barnett's qualifications or testimony as an expert. As we noted earlier, however, Brinkley's arguments lack merit. Counsel's tactical decision not to challenge Dr. Scala–Barnett's eminent qualifications reflected "an objective standard of reasonableness" under *Strickland v. Washington*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674; see, also, *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Accord *Hartman*, 93 Ohio St.3d at 296–297, 754 N.E.2d 1150; *Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 70.

{¶ 126} Further, given Dr. Scala–Barnett's qualifications, the trial court implicitly accepted her as an expert and would have readily rejected any challenge to her qualifications. See *Baston*, 85 Ohio St.3d at 423, 709 N.E.2d 128. Thus, no "reasonable probability [exists] that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. We reject proposition X.

{¶ 127} In proposition of law XIV, Brinkley claims ineffective assistance concerning counsel's failure to cross-examine witnesses differently, make more objections, or present additional mitigating evidence. But these claims lack merit. Counsel made reasonable tactical decisions "under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 128} Counsel skillfully represented Brinkley throughout the trial. For example, in cross-examining BCI scientist Ted Manasian, counsel made several key points: that he could not discern the size of the shoe from the partial prints; that an unknown number of Nike shoes had been sold; that Brinkley's shoe, while consistent with the print, may not have actually made the shoe impression. Counsel also skillfully avoided reemphasizing Manasian's direct testimony.

{¶ 129} Similarly, counsel had no reason to cross-examine Detective Michael Riddle about Brinkley's writing exemplar. Nor did counsel have any basis to extensively cross-examine a fingerprint expert, and doing so would only have emphasized damaging testimony. Nor did counsel need to cross-examine Smith's landlord, Foster Price, as to why he knew that Brinkley had written the note to him and signed Smith's name. Skillful lawyers often keep cross-examination brief and do not ask "why" questions.

{¶ 130} Counsel also represented Brinkley effectively in other respects. Counsel reasonably decided not to object to the testimony of Tonia Richardson because the identity of the person who called 911 to report Smith's death was unimportant. Counsel were not deficient in deciding that Brinkley need not be at bench conferences to discuss scheduling or legal issues. Counsel also were not ineffective by declining to object to the prosecutor's comment in closing argument that Brinkley fled to Chicago, a fact the evidence clearly established.

{¶ 131} Further, counsel made an acceptable tactical decision not to strenuously challenge Brinkley's guilt of the City Diner robbery, since very compelling evidence established his guilt of that offense. Nor can counsel be faulted for not presenting additional mitigating evidence, since the record does not disclose that such evidence was available. Cf. *State v. Coleman* (1999), 85 Ohio St.3d 129, 138, 707 N.E.2d 476. The record establishes that counsel fully inquired into Brinkley's background and consulted appropriate experts.

{¶ 132} Finally, Brinkley has failed to disclose how he was prejudiced by counsel's performance. Thus, we find no "reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. We reject proposition XIV.

{¶ 133} In proposition of law XXII, Brinkley claims that his counsel failed to preserve meritorious issues, but Brinkley never cites any record references or any specific meritorious issues that counsel failed to preserve. Because he failed to cite any example, Brinkley fails to establish deficient performance or prejudice. See *Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 91; *State v. Bey* (1999), 85 Ohio St.3d 487, 504, 709 N.E.2d 484. Moreover, the record does not disclose any meritorious issues. Thus, we reject proposition XXII.

## Prosecutorial Misconduct

{¶ 134} In proposition of law XVII, Brinkley contends that "pervasive prosecutorial misconduct" denied him due process. Although Brinkley complains about the prosecutor's argument, Brinkley frequently failed to object at trial. On those points, he thereby waived all but plain error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Moreover, his complaints lack merit.

{¶ 135} Whether a prosecutor's remarks constitute misconduct depends upon (1) whether the remarks were improper, and if so, (2) whether the remarks prejudicially affected an accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Accord *Lott,* 51 Ohio St.3d at 165, 555 N.E.2d 293. The touchstone of our analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 136} *Guilt-phase argument.* Counsel did not object, and no plain error occurred when the prosecutor commented in closing argument that Brinkley had attempted to mislead the landlord by writing a false note. The comment was a reasonable inference from the evidence.

{¶ 137} The prosecutor's comment, to which an objection was made, that Brinkley declined to talk with FBI Agent Browne about Smith's ATM card was harmless. In context, the prosecutor simply noted that Brinkley had been willing to talk about some subjects but not others. Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068.

{¶ 138} *Penalty phase.* The prosecutor's comment during the penalty-phase opening statement that mitigating factors "lessen the moral culpability of the defendant or diminish the appropriateness of the death sentence" did not constitute plain error. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 200, 702 N.E.2d 866; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 492, 653 N.E.2d 304. Moreover, the court fully instructed the jury on the appropriate weighing of mitigating factors.

{¶ 139} The prosecutor did not commit misconduct during the penalty-phase closing argument by asking the jury not to be swayed by tears from Brinkley's family. Here, the prosecutor was responding, without objection, to extensive emotional testimony from members of Brinkley's family, who pleaded with the jury not to put their son, brother, and nephew to death. "A prosecutor can respond to issues raised by an accused." *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101.

{¶ 140} Nor did the prosecutor err by briefly referring to the pain Brinkley caused Smith's family. The mention of "the personal situation of the victim's family, without more, does not constitute misconduct." *State v. Goodwin* (1999), 84 Ohio St.3d 331, 339, 703 N.E.2d 1251. Accord *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 42.

{¶ 141} The prosecutor's comment during penalty-phase closing argument that "it's not even a close call" as to a life sentence, was not plain error. Moreover, the court accurately instructed the jurors on the weighing process, including instructing the jury to choose a life sentence "if any one or more of [them] conclude that the State has failed to prove" that aggravation outweighed mitigation. Cf. *State v. Brooks* (1996), 75 Ohio St.3d 148, 160, 661 N.E.2d 1030. Accordingly, we reject proposition XVII.

### Penalty–Phase Issues

{¶ 142} *Instructions.* In proposition of law XV, Brinkley argues that errors in the penalty-phase jury instructions violated his rights and require a new penalty hearing.

{¶ 143} First, Brinkley argues that the trial court erred in instructing the jury, over objection, that mitigating factors are those which "in fairness are to be considered" instead of instructing that the factors are to be considered "in fairness and mercy." But we reject Brinkley's claims. See, e.g., *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 93 (trial court need not refer to "fairness and mercy" in reference to mitigating factors); *State v. O'Neal* (2000), 87 Ohio St.3d 402, 416, 721 N.E.2d 73 ("mercy is not a mitigating factor"); *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212 ("Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors").

{¶ 144} Second, Brinkley claims that the trial court erred in instructing the jury to "consider" a life sentence if the jury found the aggravating circumstances and mitigating factors were in equipoise. But Brinkley mischaracterizes the trial court's instructions, which follow:

{¶ 145} "If you find the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstances * * * outweigh the mitigating factors present in this case, then *it will be your duty to decide* which of the following life sentence alternatives should be imposed[.]"

{¶ 146} "* * *

{¶ 147} "If the weight of the aggravating circumstances and mitigating factors *are equal, then you must proceed to consider the life sentence alternatives.*

{¶ 148} "You are not required to unanimously find that the State failed to prove that the aggravating circumstances outweigh the mitigating factors before considering one of the life sentence alternatives. You should proceed to *consider*

*and choose one of the life sentence alternatives* if any one or more of you conclude that the State has failed to prove \* \* \* that the aggravating circumstances outweigh the mitigating factors." (Emphasis added.)

{¶ 149} Later the court reiterated:

{¶ 150} "You shall return a verdict of death if you unanimously, and that means all 12, find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not so find, you shall then begin deliberations on the life sentence options, *and, if possible, unanimously return a verdict of* [one of the life options]." (Emphasis added.)

{¶ 151} Defense counsel did not object to the instructions on this point, and we find no plain error. See *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 95 (the language of the "equipoise" instruction, "while possibly awkward, did not create plain error or prejudice"). We reject proposition XV.

{¶ 152} *Postverdict discussions with jury.* In proposition of law XVIII, Brinkley contends that the trial judge erred in holding an off-the-record ex parte discussion with jurors after the jury had returned its penalty-phase verdict but before the trial court had imposed a sentence.

{¶ 153} We previously considered and rejected an identical argument on this point in *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 96–99. We reject proposition XVIII for the same reasons. First, when the judge noted that he would speak with jurors, counsel did not object. If counsel were not present, they certainly had an opportunity to be present. Second, as in *Williams,* Brinkley never "established that he was prejudiced by any conversations." Id. at ¶ 98. Also as in *Williams,* Brinkley "has not even attempted to reconstruct what occurred." Id. Third, as in *Williams,* "when the judge and jury met, the jurors had satisfied their official task and were free to discuss the case." Id. at ¶ 99. Also, the trial court can be presumed to "consider 'only the relevant, material, and competent evidence in arriving at its judgment.' " Id., quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65. Accord *Rushen v. Spain* (1983), 464 U.S. 114, 118–119, 104 S.Ct. 453, 78 L.Ed.2d 267. Thus, on the basis of *Williams,* we reject proposition XVIII.

{¶ 154} *Sentencing opinion.* In proposition of law XX, Brinkley complains that the trial court's sentencing opinion was fatally flawed because the trial court "[made] up facts not in evidence" and improperly considered a nonstatutory aggravating circumstance.

{¶ 155} First, we reject Brinkley's assertion that the trial court made up evidence by finding that Brinkley killed Smith in order to rob her. The evidence proves that Brinkley did exactly that. On January 7, Brinkley killed Smith, stole

her coat, and attempted 16 times to access her bank account through her ATM card.

{¶ 156} Second, the trial court did not, contrary to Brinkley's assertion, rely upon on a nonstatutory aggravating circumstance, namely, prior calculation and design. Count 3, charging the aggravated murder of Smith, included prior calculation and design as an essential element of the offense charged. The jury found Brinkley guilty of that charge. Thus, that element was part of the nature and circumstances of the crime. The trial court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 157} Moreover, the trial court must examine the nature and circumstances of the offense to determine whether they are mitigating. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355, 662 N.E.2d 311. Finally, when a court correctly identifies the aggravating circumstance, "that court is presumed to rely only on that circumstance, and not on nonstatutory aggravating circumstances." *State v. Hill,* 73 Ohio St.3d at 441, 653 N.E.2d 271; see, also, *State v. Rojas* (1992), 64 Ohio St.3d 131, 142, 592 N.E.2d 1376.

### Cumulative Error

{¶ 158} In proposition of law XXI, Brinkley argues that cumulative errors during his trial denied him due process and a fair trial. However, as we explained in connection with other propositions, this case does not present multiple errors. The trial court adequately protected Brinkley's fair-trial and due process rights. "Moreover, 'errors cannot become prejudicial by sheer weight of numbers.'" *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 211, quoting *Hill,* 75 Ohio St.3d at 212, 661 N.E.2d 1068. Accord *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 100. We summarily reject proposition XXI.

### Settled Issues

{¶ 159} *Reasonable doubt.* In proposition of law XIII, Brinkley challenges Ohio's statutory definition of reasonable doubt. We summarily reject proposition XIII. See *State v. Goff* (1998), 82 Ohio St.3d 123, 131, 694 N.E.2d 916; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *State v. Cooey* (1989), 46 Ohio St.3d 20, 37, 544 N.E.2d 895; *Victor v. Nebraska* (1994), 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583.

{¶ 160} *Residual doubt.* In proposition of law XVI, Brinkley argues that residual doubt should be a mitigating factor. But we summarily reject that argument. See *Franklin v. Lynaugh* (1988), 487 U.S. 164, 173, 108 S.Ct. 2320,

101 L.Ed.2d 155, fn. 6; *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 102; *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus.

{¶ 161} *Form of specification.* In proposition XIX, Brinkley complains about the form of the R.C. 2929.04(A)(7) specification alleging that Brinkley was either "the principal offender in the * * * aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." However, Brinkley failed to preserve the issue by objection. No plain error occurred. See *State v. Twyford* (2002), 94 Ohio St.3d 340, 352, 763 N.E.2d 122; *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70. Further, the penalty instructions referred only to "principal offender" and not to prior calculation and design. Thus, no *Penix*-type error was possible. Cf. *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744; *State v. O'Neal,* 87 Ohio St.3d at 415, 721 N.E.2d 73.

{¶ 162} *Proportionality.* On the basis of settled precedent, we summarily reject Brinkley's proposition of law XXIII, which challenges Ohio's system of proportionality review. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

{¶ 163} *Constitutionality.* We summarily reject Brinkley's proposition of law XXIV, which challenges the constitutionality of Ohio's death-penalty statute. *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 104; *Poindexter,* 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Brinkley's international-law challenge also lacks merit and, not having been raised at trial, was waived. See *Bey,* 85 Ohio St.3d at 502, 709 N.E.2d 484; *Goodwin,* 84 Ohio St.3d at 349, 703 N.E.2d 1251; *Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 104.

## INDEPENDENT SENTENCE EVALUATION

### Penalty–Phase Evidence

{¶ 164} At the penalty phase, the defense presented testimony from several family members concerning Brinkley's family background, and Brinkley made an unsworn statement.

{¶ 165} Alberta Brinkley, the defendant's mother, was unmarried and 14 years old when the defendant Brinkley was born. Brinkley's father was 16 years old. When Brinkley was growing up, the family lived in a housing project in Chicago amidst crime and poverty. Alberta's second husband, Thomas, was "very abusive" and "would drink a lot and * * * fight." At times, Brinkley ran away because of the abuse. Alberta loves her son, and she told the jury, "[T]hat's the only boy I have, and please * * * don't take my son['s] life."

{¶ 166} Sean Rollins, Brinkley's younger sister, confirmed that she and her brother were raised in "[t]he ghetto, the projects" in a "bad life-style." She said she loves and needs her brother and implored the jury, "Just keep him here * * *. Don't take him away from me. * * * Just don't give him the death penalty."

{¶ 167} Regina Patterson, Brinkley's aunt, recalled that Brinkley was seven years old when his father was murdered. Patterson said she loves Brinkley "with all [her] heart. The same blood that's in [her] veins is in his veins." She said, "I [pray] for us all the time and * * * to God to give us strength always [sic] do the right thing."

{¶ 168} Jeanetta Eiland, also Brinkley's aunt, loves her nephew very much. She said, "Grady is very dear to me. If we lost him I don't know what we would do because this is my brother's child, and my brother is already gone * * *."

{¶ 169} Ruby O'Connor, Alberta's sister and Brinkley's aunt, asserted that she loves her nephew just like a son. Further, she "never had any trouble out of him," and "would like for him to not be put to death."

{¶ 170} Grady Brinkley, in an unsworn statement, apologized to Marissa Brown and her family for robbing her, and asserted that Hunter had nothing to do with the robbery of Rick's City Diner. Then he declared, "To the family of Shantae Smith, I cannot begin to tell you or even understand the pain that your family must have went through. * * * Shantae was a beautiful spirit, and * * * I did and I still do love Shantae Smith." He said that he hoped that God would heal and bring peace to her family.

{¶ 171} Then Brinkley talked at length about his love for his family and his appreciation for their support. Brinkley mentioned his wife and his wife's family, his four children, whom "daddy loves * * * more than [they] would ever know," and his mother. Brinkley also declared, "I've endured a lot of things, but * * * the power of God showed me how to overcome. * * * I trust him." Finally, Brinkley thanked the jury, the judge, and counsel. He declared that God "gave [him] life for a purpose," which he will "try to find," but that he will not beg for his life. He asked that he be allowed "to stay on this earth until God takes the breath out of that lady [his mother]. Don't take me from my family."

{¶ 172} After the jury's penalty verdict, Brinkley made a detailed statement to the trial court before being sentenced to death. Brinkley argued that his counsel's trial performance was deficient and that various tactical decisions were wrong. Brinkley also declared that the testimony of his mother and sister was false. He had not lived in the projects but had lived with his grandparents until he was 12. Brinkley apologized for the City Diner robbery but declared that he "didn't kill Shantae Smith." But he refused to ask the court to spare his life.

{¶ 173} Before sentencing Brinkley, the trial court declared that Brinkley was "a manipulative, very cold and calculating individual" with "a very cruel and vicious side." The court then sentenced Brinkley to death for Smith's murder and to consecutive prison terms for the other felonies.

### Sentence Evaluation

{¶ 174} We find that the evidence proved the aggravating circumstances that were charged. First, Brinkley purposely killed Smith so that he could use her ATM card, jump bail, flee to Chicago, and avoid trial and imprisonment for robbing the City Diner. Thus, the evidence proved the R.C. 2929.04(A)(3) specification (murder to escape trial or punishment for another offense committed by the defendant).

{¶ 175} Second, the same evidence also proved the R.C. 2929.04(A)(7) death-penalty specification (murder in the course of aggravated robbery). Brinkley committed robbery by stealing Smith's coat and ATM card in the course of murdering Smith. Photographic evidence established that Brinkley was wearing Smith's coat when he tried to use her ATM card. When the FBI arrested Brinkley in Chicago a week later, Brinkley still had Smith's coat with him. Bank records and other ATM photographs also helped to prove Brinkley's theft of Smith's coat and ATM card.

{¶ 176} As to mitigating factors, we find nothing in the nature and circumstances of the offense to be mitigating. Brinkley stole from and brutally murdered Smith in her own apartment. He did so although she had befriended him and bailed him out of jail after he was indicted for aggravated robbery.

{¶ 177} We do find, however, that Brinkley's family history and background provide mitigating features. His parents were unmarried teenagers when he was born. Brinkley was raised in desperate and deprived circumstances in a poor section of Chicago, where he was exposed to a life of drugs, crime, and poverty. However, we find no credible evidence of good character.

{¶ 178} We find inapplicable the statutory mitigating factors in R.C. 2929.04(B)(1) through R.C. 2929.04(B)(6). As to "other factors," R.C. 2929.04(B)(7), Brinkley does have strong love and support from his family, and we accord that factor mitigating weight. In his unsworn statement, Brinkley apologized for the City Diner robbery, but he never apologized or acknowledged any responsibility for killing Smith. His failure to recognize his own responsibility for Smith's murder negates any mitigating weight we might otherwise find in his recognition of the pain Smith's family suffered. Aside from his own family's support, the evidence establishes no mitigating factor under R.C. 2929.04(B)(7).

{¶ 179} In our view, the aggravating circumstances in this case, murder to escape trial, R.C. 2929.04(A)(3), and murder in the course of a robbery, R.C.

2929.04(A)(7), outweigh beyond a reasonable doubt the relatively meager mitigation that Brinkley offered. Brinkley brutally cut the throat of Smith, his own girlfriend, in order to rob her and escape trial and punishment for another aggravated robbery. Aside from the love and care of his own family and evidence of a difficult childhood, he offers no mitigating evidence. We conclude that Brinkley fully deserves the death penalty.

{¶ 180} We further find that the death penalty imposed for the aggravated murder of Smith is appropriate and proportionate when compared with other cases involving aggravated murder to escape detection, apprehension, or trial, R.C. 2929.04(A)(3), combined with murder during a robbery, R.C. 2929.04(A)(7). See, e.g., *State v. Sheppard* (1998), 84 Ohio St.3d 230, 703 N.E.2d 286; *State v. Burke* (1995), 73 Ohio St.3d 399, 653 N.E.2d 242.

{¶ 181} Additionally, we find that the death penalty is proportionate when compared with similar robbery-murder cases, some of which featured strong mitigating evidence. See, e.g., *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186; *State v. Murphy* (2001), 91 Ohio St.3d 516, 547, 747 N.E.2d 765 (deprived childhood, remorse); *State v. Smith* (2000), 89 Ohio St.3d 323, 338, 731 N.E.2d 645 (21–year–old defendant, deprived childhood, "psychotic episodes"); *Baston,* 85 Ohio St.3d at 430–431, 709 N.E.2d 128 (20–year–old defendant, neglected in childhood, remorse); *McNeill,* 83 Ohio St.3d at 453–454, 700 N.E.2d 596 (troubled upbringing, 19–year–old defendant, "borderline intelligence"); *State v. Raglin* (1998), 83 Ohio St.3d 253, 270, 699 N.E.2d 482 (troubled upbringing, 18–year–old defendant, mental problems); *State v. Benge* (1996), 75 Ohio St.3d 136, 147, 661 N.E.2d 1019 (troubled upbringing, prior good character, hard worker, lack of prior criminal convictions); *Woodard,* 68 Ohio St.3d at 79, 623 N.E.2d 75 (troubled upbringing, 19–year–old defendant); *Green,* 66 Ohio St.3d at 152–153, 609 N.E.2d 1253 (terrible childhood, IQ of 66).

{¶ 182} Accordingly, we affirm the convictions and sentence, including the death penalty.

Judgment affirmed.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'DONNELL and SLABY, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

LYNN C. SLABY, J., of the Ninth Appellate District, sitting for LANZINGER, J.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 183} Beyond a reasonable doubt, Grady Brinkley committed armed robbery of Rick's City Diner and, several weeks later, killed Shantae Smith. I would affirm the convictions in this case. I write separately because the evidence does

not support a conclusion that the murder of Smith was an aggravated murder. I would reverse the convictions on the capital specifications and remand the cause for resentencing.

{¶ 184} I have no sympathy for Brinkley; he heinously murdered his girlfriend, and he should be punished accordingly and appropriately. A majority of this court has affirmed his sentence of death, apparently concluding death to be a just sentence. Our system requires more; it requires proof beyond a reasonable doubt.

{¶ 185} Inmate Samuel Miller testified that Brinkley had planned to flee to Chicago to avoid trial on the City Diner robbery charge. Miller also testified that Brinkley had planned to kill Smith before he left town because she was dating another man. Brinkley did not link his plan to leave town and his plan to kill Smith during his discussions with Miller, and no other evidence links the two events. That they both happened, and that they could be related, does not prove beyond a reasonable doubt that Brinkley killed Smith to escape detection, arrest, or punishment for another offense. R.C. 2929.04(A)(3). Although it is possible to "reasonably conclude" that Brinkley killed Smith to escape detection, it is at least as likely that he killed her because he was angry about her perceived unfaithfulness. I need more than a reasonable conclusion before I am comfortable affirming a sentence of death; I need proof beyond a reasonable doubt.

{¶ 186} The other capital specification is even weaker. After Brinkley killed Smith, he took her ATM card and her winter coat. According to the majority, these actions transform a murder into an aggravated felony murder. The ATM card has no intrinsic value; it is not even worth the less-than-a-penny plastic it is made of. The coat has some limited value—enough, as it turns out, to allow this court to uphold a capital specification.

{¶ 187} Brinkley did not kill Smith in order to rob her or while attempting to rob her. If he had, I would likely vote to affirm the felony-murder capital specification. Appropriately punishing criminals who kill during the commission of a felony is what the felony-murder aggravating circumstance exists to accomplish. See *State v. Murphy* (2001), 91 Ohio St.3d 516, 561, 747 N.E.2d 765 (Pfeifer, J., dissenting). Brinkley, however, did not kill Smith during the commission of a felony; he killed her and then took her valueless ATM card and her cheap winter coat. "When petty theft * * * elevates a murder to a felony-murder capital offense, I believe a death sentence is not appropriate." *State v. Carter* (2000), 89 Ohio St.3d 593, 611, 734 N.E.2d 345 (Pfeifer, J., concurring). I cannot with a good conscience affirm a sentence of death based on the facts in this case. I affirm in part and dissent in part.

Julia R. Bates, Lucas County Prosecuting Attorney, J. Christopher Anderson, and Brenda J. Majdalani, Assistant Prosecuting Attorneys, for appellee.

Jeffrey M. Gamso and Spiros P. Cocoves, for appellant.