[Cite as *State v. Keeton*, 2020-Ohio-950.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-8 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-278 |
| | : | |
| MICHAEL A. KEETON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of March, 2020.

. . . . . . . . . . .

JAMES D. BENNETT, Atty. Reg. No. 0022729, Assistant Prosecuting Attorney, Darke County Prosecutor's Office, 504 South Broadway, Suite 3, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

ALEXANDER PENDL, Atty. Reg. No. 0093792, 121 West Third Street, Greenville, Ohio 45331
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Michael A. Keeton appeals from his convictions for aggravated robbery and misuse of a credit card. For the reasons set forth below, we affirm.

## I.    Facts and Procedural Background

{¶ 2} On December 5, 2018, Johnny Wright walked to an ATM machine behind the Darke County Courthouse and used his debit card to obtain $40. Wright then walked to a Family Dollar store, where he purchased a cellular telephone card for $27. He then began to walk to a homeless shelter where he was residing. As he was walking, Wright was confronted from behind by a person who held a gun to Wright's back and ordered him to hand over his money. Wright began to turn toward the assailant but he was shoved to the ground. The assailant pointed the gun at Wright's chest and took the remaining $13 in cash withdrawn from the ATM. The assailant also took Wright's wallet, which contained his driver's license, social security card, Medicaid card, family pictures, debit card and ATM card. The assailant then ran down the street, turned a corner, and disappeared from view.

{¶ 3} Following an investigation, Keeton and Charles Gray were each indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and one count of misuse of credit cards in violation of R.C. 2913.21(B)(2). The aggravated robbery counts carried firearm specifications. Alicia Wiedmaier was also indicted, but those charges were dismissed in exchange for her testimony against Gray and Keeton.

{¶ 4} In February 2019, the State filed a motion to consolidate Keeton's case and Gray's case so that the cases would be tried together. Although Keeton objected, the

trial court granted the motion.   The trial commenced in June 2019.

{¶ 5} The State presented the testimony of Wright regarding the robbery.   The State also presented Alicia Wiedmaier, who testified that she was residing in Palestine, Ohio, on December 5, 2018.   On that date, Gray and Keeton came to her residence and the three started "getting high" and "talking about selling meth."   Tr. p. 271.   Wiedmaier testified the group decided to drive around Greenville in order to execute the discussed methamphetamine trafficking.   She testified that they were traveling in a black vehicle driven by Keeton when they observed Wright at an ATM machine.   She testified that Keeton and Gray decided to rob Wright; they pulled into a parking lot, at which time Keeton retrieved a gun from the center console of the vehicle and handed it to Gray. Wiedmaier testified that Gray put on a mask and exited the car.   Gray then returned to the car and indicated that he had lost sight of Wright.   As the group continued to drive around, they observed Wright exit the Family Dollar store.   Gray once again exited the vehicle.   Wiedmaier then testified that she observed Gray standing above Wright and waving the gun over him.   She also testified that she heard Gray say "Don't make me shoot you."   Tr. p. 283.

{¶ 6} Wiedmaier testified that Gray returned to the car after taking Wright's money and wallet.   The group then drove to an ATM at Fifth Third Bank where Gray used Wright's card to withdraw money.   The group then drove to Chase Bank, and Gray again used the card to withdraw money from an ATM.   After this, Keeton drove to Hibbert's Sporting Goods ("Hibbert's"), entered the store, and purchased a hat and gloves. Thereafter, the group drove to Union City to Casey's General Store ("Casey's"), where all three made purchases.

**{¶ 7}** During her testimony, Wiedmaier admitted that she was a drug addict with a substantial felony criminal record.  She testified that the State had promised to dismiss the charges filed against her in this case in exchange for her testimony against Gray and Keeton.  She also testified that she was awaiting extradition to Oklahoma regarding a conviction for assault and battery on police officers.

**{¶ 8}** The State also presented the testimony of Greenville Police Detective Ryan Benge, who responded to the scene of the robbery; he testified that he found footprints and patterns in the snow that were consistent with Wright's claim that he had been followed and knocked down.  Benge testified that Wright called the police department the next day to report that he had called his bank and learned his debit card had been used.  Benge testified the card was used to withdraw $180 from the Fifth Third Bank ATM approximately 24 minutes after Wright was assaulted.  The card was then used seven minutes later at the Chase Bank ATM where $100 was withdrawn.  Finally, the card was used at Casey's in Union City approximately 90 minutes later.

**{¶ 9}** Benge traveled to Casey's, where he was able to obtain a video depicting activity within the store.  The video admitted into evidence showed Keeton, Wiedmaier and Gray entering the store and making purchases.  The video showed Gray, with Wiedmaier at his side, using Wright's ATM card.  The video showed Keeton placing money on the counter to make his purchase.  In the video, Keeton was wearing one glove, a white Cincinnati Reds baseball cap and a two-toned sweatshirt.  Gray was wearing a black cap, a black coat and jeans; this clothing was consistent with Wright's description of the clothing his assailant wore.  The video also showed that Gray had tattoos on both sides of his neck.  The video showed that all three exited the store but

re-entered at varying times to purchase lottery tickets. Video from outside showed the trio with a black vehicle. Benge testified that the car was distinctive because it did not have a front license plate and because the rear tire on the driver's side had a hubcap that did not match the other three tires.

{¶ 10} Benge testified that, as he was watching the video from Casey's, he received a dispatch regarding suspicious activity at an address later identified as Wiedmaier's. The dispatch mentioned a vehicle that appeared to match the vehicle depicted in the video. Benge responded to the address where he observed the black vehicle seen in the video. Benge obtained a search warrant and caused the car to be towed and its contents to be inventoried. The search of the car revealed cups from Casey's and lottery tickets. The search also revealed a wallet which Wright later identified as his. A receipt from Hibbert's for the purchase of a Cincinnati Reds baseball cap and gloves was also found.

{¶ 11} Benge also traveled to Indiana, where he met with the owner of the subject vehicle; the owner informed him that she had loaned the car to Keeton, and he had failed to return the car. Benge also testified that he obtained a video from Fifth Third Bank showing an individual wearing a black coat and a mask using Wright's debit card to make a withdrawal. The video, which was admitted into evidence, revealed that the individual had tattoos on each side of his neck. The video also showed the car towed from Wiedmaier's residence. Benge later obtained video from Chase Bank which showed the same vehicle and the same masked individual using Wright's card to make a withdrawal.

{¶ 12} Benge met with Wiedmaier at her home on December 12, 2018. Based upon his interview with her, he obtained arrest warrants for Gray and Keeton. Benge

testified that when Keeton was booked into jail, a two-toned sweatshirt was taken into evidence. Pictures of the sweatshirt matched the sweatshirt worn by Keeton as seen in the video from Casey's. When Gray was booked into jail, a black hat matching the hat seen in the videos from Casey's and both banks was taken into evidence.

{¶ 13} Finally, the State presented the testimony of Allison Gapinski, who worked in the DNA unit of the Ohio Bureau of Criminal Investigation. Gapinski testified she conducted a DNA analysis of Wright's wallet and concluded that Wright, Gray and Keeton were "all included as possible major contributors to the interior of the wallet with a statistic of 1 in 300." Tr. p. 393.

{¶ 14} The defense did not call any witnesses.

{¶ 15} Following the trial, the jury convicted Keeton on both charges as well as the attendant firearm specification. The trial court sentenced Keeton to a prison term of seven years. Keeton appeals.

## II.    Trial Consolidation

{¶ 16} The first assignment of error asserted by Keeton is as follows:

THE TRIAL COURT ERRED BY CONSOLIDATING APPELLANT'S TRIAL

WITH CO-DEFENDANT CHARLES GRAY'S TRIAL.

{¶ 17} Keeton claims that the trial court erred by conducting a joint trial because it hindered him in his ability to fully cross-examine Wiedmaier, resulted in the introduction of improper evidence and caused jury confusion.

{¶ 18} "Joinder is the rule rather than the exception, and it is favored by the law." *State v. Howard*, 1st Dist. Hamilton No. C-100240, 2011-Ohio-2862, ¶ 15, citing *State v.*

*Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). The law favors joinder because a single trial conserves time and expense and may minimize the potentially disparate outcomes that can result from successive trials before different juries. *State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990); *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). This preference for joint trials is not unrestricted. Crim.R. 14 permits a defendant to seek severance of his case from a co-defendant's case if joinder will result in prejudice. The defendant bears the burden of establishing such prejudice. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29, citing *Torres* at syllabus. We review a trial court's refusal to order separate trials for an abuse of discretion. *Id.*

{¶ 19} Keeton first contends that being tried jointly with Gray hindered his ability to cross-examine Wiedmaier. In support, he points to a passage in the trial transcript wherein his counsel asked Wiedmaier whether she recalled informing Benge she was afraid of Gray. Wiedmaier denied making such a statement. Counsel then asked Wiedmaier to read a portion of the transcript of her interview with Benge in order to refresh her memory. After doing so, Wiedmaier again testified that she did not recall telling Benge she feared Gray. Counsel then asked Wiedmaier whether Benge had asked her if Gray was a violent person. Wiedmaier testified that he had not. Counsel then asked her to review the interview transcript again.

{¶ 20} At that point, counsel for Gray objected and, at sidebar, indicated that the portion of the transcript Wiedmaier was asked to review mentioned Gray had been involved in a prior robbery case. Counsel for Keeton then stated that he was not directing Wiedmaier to read the reference to the prior robbery and that even if the transcript were

admitted into evidence, the portion referring to the prior offense could be redacted. The State then noted that counsel's use of the transcript was opening the door to the introduction of impeachment evidence against both defendants. Keeton's counsel then withdrew the question.

{¶ 21} Keeton contends Gray's objection to the use of the transcript forced him to abandon his line of questioning and prevented him from conducting a full cross-examination of Wiedmaier. He argues that because Wiedmaier's testimony provided the only evidence of his involvement in the offenses, it was crucial to expose the inconsistencies between her trial testimony and her interview with Benge.

{¶ 22} We first note that the interview transcript is not before us and, thus, we have no way to ascertain its content. Therefore, we cannot determine whether Wiedmaier's testimony actually was inconsistent with statements she made to Benge. Further, we cannot say that Keeton's cross-examination was limited by Gray's objection. Indeed, it is clear from reading the trial transcript that Gray's counsel merely wanted to ensure Wiedmaier did not inadvertently mention the reference to Gray's prior criminal history. Otherwise, Gray's counsel did not object to the use of the transcript. It appears from reading the entire passage cited by Keeton that his counsel was, instead, prompted to discontinue his line of questioning in order to avoid having the State seek to use the transcript for purposes of impeachment. Thus, we cannot conclude that Keeton has demonstrated prejudice.

{¶ 23} Keeton next objects to statements made by Wiedmaier during her testimony. Specifically, Wiedmaier testified that just before the robbery, Gray stated that he did not want to go back to prison. Shortly thereafter, she testified Gray got back into

the car after accosting Wright and stated, "I thought the mother f * * *er was going to make me shoot him. He wouldn't give me his wallet." Tr. p. 284. Keeton contends these statements would not have been admissible in a trial against him alone. He further contends that these statements, which acted to show that "Gray [was] nefarious, [and had a] criminal history and [a] disregard for human life[,]" caused "the jury to attribute the same criminality and sociopathy to him."

{¶ 24} The record shows that counsel for Gray objected to the statement about a return to prison. Thereafter, the trial court gave the jury a limiting instruction and ordered the jury to disregard the statement. We presume that juries follow the instructions provided to them. *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000). No objection was made to the second statement. Thus, we are limited to a plain error review. *State v. Santiago*, 10th Dist. Franklin No. 02AP-1094, 2003-Ohio-2877. To make a showing of plain error, an appellant "must establish that an error occurred, that the error was obvious, and that the error affected his * * * substantial rights." (Citation omitted.) *State v. Reddix*, 8th Dist. Cuyahoga No. 107672, 2019-Ohio-2441, ¶ 7. Notice of plain error "is to be taken with the utmost caution, [only in] exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 25} We cannot say that the admission of these statements changed the outcome of this case. The jury was specifically instructed to "consider the evidence applicable as to each Defendant as though he were being separately tried." Court's Exh. 1. The instructions further stated that the jurors were not to let their findings regarding either defendant influence their findings as to the other. Again, we presume that the jurors

followed the instructions given to them.

{¶ 26} Having reviewed the record, we conclude the trial court properly exercised its discretion in granting the State's motion to consolidate the trials of Keeton and Gray and overruling Keeton's objection thereto. Therefore, the first assignment of error is overruled.

### III.     Claimed Prosecutorial Misconduct

{¶ 27} Keeton's second assignment of error states as follows:

APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO IMPROPER COMMENTS OF THE PROSECUTING ATTORNEY.

{¶ 28} Keeton alleges prosecutorial misconduct occurred during the voir dire, opening statement, closing argument and rebuttal closing argument. We will address each of these arguments in turn.

{¶ 29} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected any substantial right of the accused." *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "However, the touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, citing *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). This court has recognized prosecutors are given wide latitude in their closing arguments to draw inferences from the testimony heard and the evidence presented, but, of course, this latitude is not without limit. *State v. Lillicrap*, 2d Dist. Montgomery No. 23958, 2011-Ohio-3505, ¶ 6. "In reviewing allegations of prosecutorial misconduct, we review the

alleged wrongful conduct in the context of the entire trial," and if "it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed." (Citation omitted.) *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

{¶ 30} Defense counsel did not raise an objection to any of the claimed improper statements made by the prosecutor during voir dire, opening statement or closing argument. Thus, we are limited to a review for plain error.

{¶ 31} Keeton first claims that, during voir dire, the prosecutor improperly expressed a personal opinion about the strength of the State's evidence by stating, "I believe, of course, I have sufficient evidence." Tr. p. 69. A reading of the entire passage indicates that immediately prior to the cited statement, the prosecutor discussed the State's burden of proof. And, immediately after the statement, the prosecutor stated that regardless of his belief regarding the sufficiency of the evidence, the jurors were the triers of fact and it was their job to decide whether the State had met its burden. We conclude that Keeton has not demonstrated misconduct with regard to this statement.

{¶ 32} Next, Keeton objects to a statement made by the prosecutor during opening statements. Specifically, the prosecutor stated, "I can tell you that the evidence in this case is pretty overwhelming, that these people robbed this guy." In reading the entirety of this passage, we note that prior to the statement, the prosecutor had been discussing the evidence the State intended to submit during the trial. The prosecutor ended the passage by correctly stating that it had the burden of proof to convince the jurors of Keeton's guilt beyond a reasonable doubt. Again, we find no misconduct.

{¶ 33} Keeton also contends that the prosecutor acted improperly during closing argument by stating "* * * I believe that you have more than enough evidence, more than enough proof beyond a reasonable doubt that these two guys robbed this Johnny Wright, used the debit card and stole his money." As with the statements above, we conclude the prosecutor was merely commenting that, based upon the evidence presented, the State had met its burden of proof. This does not constitute misconduct.

{¶ 34} Finally, Keeton complains that during rebuttal closing argument, the prosecutor stated, "I get the last word to talk about the garbage and mischaracterization that you just heard from the defense attorneys." Tr. p. 527. The prosecutor also referred to the closing argument made by both defense counsel as "absurd".

{¶ 35} We have stated that it is improper for a "prosecutor [to] continuously characterize[e] the defense theory as one of deception," and we have also stated that "[w]hile a prosecutor may urge the jury to give little or no weight to the defense's case, * * * attempts by the prosecutor to persuade the jury that the defense is trying to mislead them [are] improper." (Citations omitted.) *State v. Ward*, 2d Dist. Montgomery No. 18211, 2001 WL 220244, *6 (Mar. 2, 2001). The prosecutor's statements suggesting that defense counsel "mischaracterized" the evidence and that defense counsel's arguments were "absurd" were within the wide latitude a prosecutor is afforded during closing argument. On the other hand, calling the defense arguments "garbage" arguably constituted an improper attempt to convince the jury that defense counsel was attempting to mislead. However, we cannot conclude that the prosecutor's one-time use of the word "garbage" amounts to plain error.

{¶ 36} We conclude that Keeton has failed to demonstrate prosecutorial

misconduct.   Accordingly, the second assignment of error is overruled.


## IV.    Conclusion

{¶ 37} Both assignments of error being overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .


HALL, J. and WELBAUM, J., concur.


Copies sent to:

James D. Bennett
Alexander Pendl
Hon. Jonathan P. Hein