**[Cite as *State v. Gray*, 2020-Ohio-1402.]**

# IN THE COURT OF APPEALS OF OHIO
# SECOND APPELLATE DISTRICT
# DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-279 |
| | : | |
| CHARLES H. GRAY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 10th day of April, 2020.

. . . . . . . . . . .

JAMES D. BENNETT, Atty. Reg. No. 0022729, Assistant Prosecuting Attorney, Darke County Prosecutor's Office, 504 South Broadway, Suite 3, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

BYRON K. SHAW, Atty. Reg. No. 0073214, 4800 Belmont Place, Huber Heights, Ohio 45424
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Charles H. Gray, appeals from his conviction in the Darke County Court of Common Pleas for aggravated robbery with a firearm specification and misuse of credit cards. In support of his appeal, Gray challenges the trial court's denial of his motion for mistrial premised upon certain statements made by one of the State's witnesses. Gray also advances arguments effectively assailing the weight of the evidence in support of his convictions. Finally, Gray opposes the trial court's refusal to afford him and co-defendant, Michael Keeton, separate trials. Finding no error, the judgment of the trial court will be affirmed.

## I.    Facts and Course of Proceedings

{¶ 2} On the morning of December 5, 2018, Johnny Wright awoke and decided to head to a local store to make a purchase. At the time, 67-year-old Wright resided at a homeless shelter in Greenville. He walked to an ATM and withdrew $40 cash, then continued to a Family Dollar Store where he purchased a phone card.

{¶ 3} On his way back to the shelter, Wright realized he was being followed by a man on foot. The stranger caught up with him and put a gun to his back, demanding money. Wright turned around, at which time the stranger pushed him to the ground and pointed the weapon at his chest. Wright handed over his remaining cash and his wallet. The assailant took the items and ran off, disappearing around a corner. Wright was shaken up, but uninjured. He immediately reported the incident to the police.

{¶ 4} Wright told police his assailant was outfitted in a black coat, black hoodie, and stocking hat. He was also wearing a black plastic mask that obscured his face from the nose down. Wright was unable to identify his assailant from a photo lineup.

{¶ 5} The next day, police learned that Wright's stolen debit card had been used at three different establishments in the hours following the robbery. Lead detective Ryan Benge of the Greenville Police Department followed up with Wright's bank to gather details. The card was used at Fifth Third Bank and Chase Bank branches in Greenville, and at a business known as Casey's General Store in Union City. Surveillance videos obtained from the locations revealed a trio of individuals arriving in a distinctive black Chevrolet Impala, and using Wright's debit card and stolen funds. One of the three wore a black stocking hat, black jacket, and blue jeans. That man was later identified as Indiana resident Charles Gray. His cohorts were Michael Keeton and Palestine resident Alicia Wiedmaier.

{¶ 6} On December 20, 2018, a Darke County Grand Jury returned identical indictments against Gray and Keeton. Count one charged aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony, and was accompanied by a three-year firearm specification. *See* R.C. 2929.14(B)(1)(a)(ii)/R.C. 2941.145. Count two charged of misuse of credit cards under R.C. 2913.21(B)(2)/(D)(4), a fifth-degree felony. Wiedmaier was also indicted, but those charges were dropped in exchange for her testimony against Gray and Keeton.

{¶ 7} Subsequent to the indictments, the State moved to consolidate the cases against Gray and Keeton for trial. The trial court granted the motion over Keeton's objection. The matter proceeded to trial in June 2019, whereupon both men were found guilty as charged.[1] The trial court sentenced Gray to serve an aggregate term of seven

---

1. Keeton separately appealed his conviction and sentence. *See State v. Michael A. Keeton*, 2d Dist. Darke No. 2019-CA-8, 2020-Ohio-950.

years in prison, including a mandatory three-year term on the firearm specification and a consecutive four-year term on the aggravated robbery count. Gray was ordered to pay court costs and expenses on the misuse of credit cards count.

{¶ 8} Gray now appeals, raising three assignments of error, which we will address out of order for ease of analysis.

## II.     The Propriety of Joinder and Denial of Severance

{¶ 9} In his third assignment of error, Gray contends that joinder of trials in this case was solely based upon convenience and was therefore improper. Gray notes that Ohio law disfavors joinder of offenses solely because they are of a same or similar character, particularly where unrelated offenses involve different times, locations, and witnesses. Here, according to Gray, separate trials were warranted because the alleged crime spree spanned different times and locations. We find these arguments to be unpersuasive.

### Standard of Review

{¶ 10} At trial, counsel for Keeton renewed his pretrial motion for severance. Although the record is not clear, it seems the trial court understood that counsel for Gray joined in the severance motion and treated Gray as doing such. We will thus review the trial court's denial of severance for an abuse of discretion. *State v. Ramsey*, 2d Dist. Montgomery No. 25264, 2013-Ohio-2124, ¶ 17. An abuse of discretion connotes a decision that was arbitrary, unreasonable, or unconscionable. *State v. Russell*, 2d Dist. Clark No. 2011-CA-10, 2012-Ohio-4316, ¶ 27, quoting *Hufman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985).

**Analysis**

{¶ 11} Crim.R. 8(B) governs joinder of co-defendants. The rule provides, in pertinent part, that

> [t]wo or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct.

{¶ 12} In its appellate brief and below, the State explained that the computerized docketing system for the Darke County Court of Common Pleas is not equipped to accept joint indictment of multiple defendants as contemplated by Crim.R. 8(B). All criminal cases in Darke County must be charged individually and accorded their own case numbers. Thereafter, the proponent of joinder is tasked with moving for consolidation of the cases. Despite this variation in procedure, the Criminal Rules implicated vis-à-vis joinder and severance are the same. *See id. See also* Crim.R. 13 (providing that "[t]he court may order two or more indictments or informations or both to be tried together, if * * * the defendants could have been joined in a single indictment or information"); Crim.R. 14 (providing for relief from prejudicial joinder).

{¶ 13} It is well established that joinder of defendants is favored in the eyes of the law, for this procedural tool "conserves judicial and prosecutorial time, lessens the expenses of multiple trials, diminishes the inconvenience to witnesses, and minimizes the possibility of incongruous results from successive trials before different juries." *State v. Payne*, 10th Dist. Franklin Nos. 02AP-723 and 02AP-725, 2003-Ohio-4891, ¶ 27, citing *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980). Nonetheless, the law

recognizes that an otherwise proper joinder may prejudice a defendant's right to a fair trial, requiring severance under Crim.R. 14. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. The burden lies with the defendant to affirmatively establish that he will suffer prejudice by said joinder. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29, citing *Torres* at syllabus.

{¶ 14} Gray's argument that separate trials were in order because the crime spree spanned a period of hours and different locations misses the mark. Both Keeton and Gray were charged with identical offenses and specifications arising from the same series of events. *Compare State v. Bundy*, 7th Dist. Mahoning No. 02 CA 211, 2005-Ohio-3310, ¶ 57 (trial court did not abuse its discretion in declining to sever trials for multiple co-defendants charged in an aggravated robbery and conspiracy case in view of the fact that each of the counts in their respective indictments arose from the same series of transactions). Furthermore, the fact that Gray was charged as the principal and Keeton as an accomplice did not affect the propriety of joinder under the facts and circumstances of this case.

{¶ 15} Similarly, Gray's insistence that convenience was the sole factor underscoring the trial court's joinder decision is unsupported by the record. The investigation into the robbery of Wright necessarily entailed an overlap of evidence, witnesses, and law enforcement efforts with regards to Gray and Keeton. Joint trial of the two men furthered aims exceeding simple convenience. It served to advance the customary goals of judicial and prosecutorial economy, decreased expense, and minimized chance of incongruous results. *See Thomas* at 225.

{¶ 16} Finally, the trial court instructed the jury that the evidence against Gray and Keeton was to be considered separately and each verdict rendered individually. Juries are presumed to follow instructions. *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000). Gray has directed our attention to nothing in the record to rebut this presumption.

{¶ 17} In view of the above, we cannot say that the trial court exceeded the bounds of its discretion in joining the cases against Gray and Keeton for trial. Gray's third assignment of error is overruled.

### III.    Manifest Weight of the Evidence

{¶ 18} Though phrased in terms of sufficiency, Gray's second assignment of error actually challenges the weight of the evidence supporting his convictions. Gray maintains that the record does not support that he was the assailant who robbed Wright. Specifically, Gray points to the fact that Wright was unable to identify his mask-wearing assailant in the photo lineup. Gray further submits that no DNA evidence linked him to the pilfered wallet or its stolen contents. Finally, Gray argues that the record does not support that a firearm was used in the robbery, particularly where no firearm was ever found by law enforcement. These contentions lack merit.

### Standard of Review

{¶ 19} Unlike an attack on the sufficiency of the evidence, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12.

In conducting a manifest weight review, this Court scrutinizes the entire record, weighs the evidence and all reasonable inferences flowing therefrom, considers the credibility of the witnesses, and determines whether the jury clearly lost its way in resolving evidentiary conflicts culminating in a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193.

{¶ 20} It is well accepted that "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 21} As we have previously observed, " '[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' " *State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 59 (2d Dist.), quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

**Aggravated Robbery and Firearm Specification**

{¶ 22} In pertinent part, the aggravated robbery statute criminalizes the commission of a theft offense while possessing and brandishing or using a deadly weapon. R.C 2911.01(A)(1). The attendant firearm specification in Gray's indictment requires the imposition of a mandatory three-year prison term where one engages in such behavior. R.C. 2929.14(B)(1)(a)(ii)/R.C. 2941.145. Our review of the record reveals a breadth of competent, credible evidence in support of Gray's aggravated robbery conviction and the attached firearm specification.

{¶ 23} To begin, Wright told police that his assailant was wearing a black coat, black hoodie, stocking hat, and a black plastic mask. It is true that Wright was unable to identify his assailant from a police lineup due to the fact that the mask obscured too much of the man's face. It is equally true that Gray was not pictured in the lineup. Surveillance videos obtained from the two banks, a nearby motel, and the general store consistently showed Gray, Keeton, and Weidmaier pull up in the distinctive black Chevrolet Impala. Gray wore a black stocking hat, black jacket, and blue jeans. This aligned with Wright's description of his assailant's clothing. Detective Benge seized a black stocking hat that had been secured as Gray's property when he was booked into the Darke County Jail on the arrest warrant in this case. Even more condemning, Gray's neck tattoos could be seen in the surveillance videos. Tattoos make for distinguishing identifiers at times, particularly where situated in an area of the body not quite so commonly seen.

{¶ 24} Wiedmaier was the first individual identified by police in the video obtained from Casey's General Store. Detective Benge happened to overhear a police dispatch describing a suspicious-looking black Impala in the driveway of Wiedmaier's Palestine residence. Believing it sounded like the same vehicle from the Casey's video, he and his

partner responded to the scene. The vehicle was a match. Peering inside, they could see items from Casey's General Store. After the house's inhabitants failed to answer the front door, Detective Benge had the car towed to the police station. A subsequent search yielded a cup from Casey's General Store, scratch-off lottery tickets purchased from the store, and a receipt from Hibbett Sports. Wright's wallet was also seized from the vehicle, where it had been wrapped in blue latex gloves.

{¶ 25} The detectives learned that the black Impala was registered to an Indiana woman by the name of Michelle Rosser. They visited Rosser, who indicated she allowed Keeton to borrow the car a week prior and he never returned it. Rosser identified both Keeton and Gray from still shots pulled from the Casey's General Store surveillance video.

{¶ 26} One week after the robbery, Detective Benge interviewed Alicia Wiedmaier at her residence. Based upon the information she provided, the detective obtained arrest warrants for Gray and Keeton. Detective Benge received the surveillance video from Chase Bank nearly two weeks into the investigation. The video showed the black Impala parking at a nearby Dollar General Store. Gray approached and used the Chase ATM wearing a black coat, hat, black mask, jeans, and a black Franklin batting glove. Police recovered the batting glove from the Impala.

{¶ 27} Detective Benge also received surveillance video from Fifth Third Bank and a nearby motel. The same black Impala pulled into the Fifth Third parking lot. Gray could be seen using the victim's debit card at the ATM. He was wearing the same black stocking hat, black mask, black jacket, and jeans. His neck tattoos were also visible in the video.

{¶ 28} Much of the defense's case focused upon attempts to discredit key witness

Alicia Wiedmaier. The 32-year-old mother of five had an extensive criminal record and was struggling with drug addiction when she met Gray and Keeton. At the time of trial, Wiedmaier was being held in the Darke County Jail awaiting extradition to Oklahoma for an unrelated offense. In exchange for her testimony against Gray and Keeton, the State agreed to grant her immunity and dismiss the charges against her arising from the instant matter. Detective Benge opined that, although Wiedmaier was untruthful on some details, the overwhelming corroborative evidence she provided aligned with the victim's rendition of events precipitating the robbery.

{¶ 29} According to Wiedmaier's testimony, the trio was hanging out at her residence in Palestine on the morning in question, ingesting drugs and discussing their need to procure some cash. They settled upon trying to sell methamphetamine to some of Wiedmaier's contacts in Greenville. The group climbed into the black Impala Keeton borrowed from a friend and headed out.

{¶ 30} Wiedmaier testified that they were driving around town when they saw a man at an ATM withdrawing money. That man was Johnny Wright. Keeton gave Gray a black handgun, and Gray donned a facemask. According to Wiedmaier, Gray was wearing a black shirt, jeans, and a sock hat. He got out of the car and started following the man on foot.

{¶ 31} At some point, Gray returned to the car after losing sight of Wright. The trio spotted the man as he was leaving a Family Dollar Store, and Gray resumed tailing him on foot. Wright picked up his pace, apparently aware he was being followed. Keeton parked the car nearby, at which time Wiedmaier saw Gray standing over the victim and wielding the gun. After seizing the man's property, Gray got back into the car and said he

"thought the mother f * * *er was going to make me shoot him. He wouldn't give me his wallet." (Tr. 284).

**{¶ 32}** Wiedmaier indicated that Gray changed the pin number on one of the victim's cards and withdrew cash from two ATMs. The trio continued on to Hibbett Sports, where Keeton purchased a few items. Next, the crew traveled to Union City to explore selling methamphetamine. While there, they used Wright's debit card and stolen cash to purchase lottery tickets and other items from Casey's General Store. Wiedmaier identified still shots taken from surveillance video depicting her, Gray, and Keeton inside the establishment. The cohorts left the store and, after ingesting drugs at a nearby residence, returned to Wiedmaier's house in Palestine. Roughly one week later, Detective Benge came to Wiedmaier's residence to interview her about the robbery.

**{¶ 33}** Detective Benge retrieved Wright's stolen wallet from the black Impala. Wright furnished a DNA sample for the detective via buccal swab. The sample made its way to forensic scientist Allison Gapinski of the Ohio Bureau of Criminal Investigation. On appeal, Gray focuses upon the first of three DNA reports produced by Gapinski in connection with the case. The initial report indicated that a DNA specimen collected from the wallet was unsuitable for comparison because it contained a mixture of genetic material from three or four individuals. But the DNA evidence did not begin and end with the first report.

**{¶ 34}** The second report complemented Wright's DNA with a more targeted specimen collected from the wallet's interior. This swabbing revealed a mixture from at least five people. Even so, Gapinski was able to distinguish three major contributors, one of whom was Wright. She did not yet have buccal swabs from any other individuals to

which to compare the sample.

{¶ 35} The third report concerned DNA collected from Gray and Keeton after their respective arrests. When those swabs were compared to the targeted DNA sample from inside the wallet, both Gray and Keeton emerged as major contributors.

{¶ 36} Finally, Wiedmaier gave Detective Benge bullets from the gun she said Gray used in the robbery, which she shot at her residence after the spree. The gun itself was never recovered. Though there was some discrepancy in the record concerning whether the gun was a revolver or a semiautomatic pistol, this does not warrant reversal on manifest weight grounds. The remaining evidence in support of Gray's guilt was simply too overwhelming.

{¶ 37} In view of the credible evidence detailed above, we conclude that Gray's robbery conviction and the attendant firearm specification were not against the manifest weight of the evidence.

### *Misuse of Credit Cards*

{¶ 38} Though Gray did not expressly challenge the weight of the evidence supporting his conviction for misuse of credit cards, we note that the record contains copious competent and credible evidence in support of that conviction as well. In relevant part, the statute concerning misuse of credit cards prohibits an individual from fraudulently obtaining property or services by use of a stolen credit card. R.C. 2913.21(B)(2).The offense is elevated to a fifth-degree felony where the victim is an elderly person or a disabled adult. R.C. 2913.21(D)(4).

{¶ 39} Victim Johnny Wright's testimony that he was 67 years old at the time of the

robbery was undisputed. Wright indicated his wallet contained his driver's license, Social Security card, ATM card, and a debit card, among other items. Wright's monthly Social Security benefits were deposited into the account connected to the debit card. When he contacted his bank after the robbery, Wright learned that the pin number on the card had been changed and $300 withdrawn from the account.

{¶ 40} Per Wiedmaier's testimony, Gray used Wright's personal information garnered from his driver's license and Social Security card to change the pin number on the debit card. As stated, Gray was readily identified in surveillance videos withdrawing money from ATMs at Fifth Third Bank and Chase Bank. Surveillance video pulled from Casey's General Store similarly showed Gray holding the stolen debit card and using it to purchase items. Later in the investigation, the manager from Casey's General Store provided Detective Benge with the receipt for the transaction wherein Gray used the stolen debit card. Again, this review demonstrates an overwhelming amount of credible evidence in favor of Gray's guilt on the misuse of credit cards count in the indictment.

{¶ 41} The above analysis compels the conclusion that the jury did not lose its way in rendering a guilty verdict against Gray on all counts. Gray's second assignment of error is overruled.


### IV.    Motion for Mistrial

{¶ 42} Gray's first assignment of error criticizes the trial court's refusal to grant a mistrial due to certain incriminating statements elicited by the State during the direct examination of Alicia Wiedmaier.

{¶ 43} Gray refrained from taking the witness stand at trial to avoid the unearthing

of his criminal record. Despite this exercise of privilege, Gray contends, the State was allowed to introduce inadmissible character evidence through Wiedmaier. Specifically, Wiedmaier testified that the trio attempted to sell methamphetamine on the day of the robbery, and that Gray made a statement about not wanting to go back to prison. Gray decries these references as other acts evidence which violated the presumption against admissibility memorialized in Evid.R. 404(B) and R.C. 2945.59. He concludes that the resultant prejudice denied him a fair trial.

### Standard of Review

{¶ 44} Typically, we employ an abuse of discretion standard in reviewing a trial court's decision granting or denying a motion for mistrial. *State v. Sanders*, 2016-Ohio-4724, 66 N.E.3d 1239, ¶ 56 (2d Dist.), quoting *State v. Garner,* 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Because defense counsel objected to the comment about Gray not wanting to return to prison, this standard guides our review of the trial court's refusal to grant his motion for mistrial on that basis.

{¶ 45} Conversely, Wiedmaier's comment about the trio trying to sell methamphetamine did not draw an objection from defense counsel. Our review concerning the trial court's refusal to grant a mistrial premised on this comment is governed by the plain error standard. Plain error results where there is an obvious deviation from a legal rule which affected the outcome of the proceedings. *State v. Kline*, 2d Dist. Champaign No. 2009-CA-02, 2010-Ohio-3913, ¶ 5, quoting *State v. Rohrbaugh,* 126 Ohio St.3d 421, 2010-Ohio-3286, ¶ 6. As always, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. McShann*, 2d Dist. Montgomery No.

27803, 2019-Ohio-4481, ¶ 46, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**Analysis**

{¶ 46} Evid.R. 404(A) codifies what is commonly referred to as "the propensity rule," meaning character evidence is generally inadmissible to prove action in conformity therewith. *State v. Zuern*, 32 Ohio St.3d 56, 59, 512 N.E.2d 585 (1987). As this Court previously explained, "[i]t is improper to admit evidence of other crimes, wrongs or acts by a defendant, wholly independent of the offense for which he is on trial. * * * This is known as the propensity rule, and it prohibits using evidence of other acts of wrongdoing to establish that a defendant committed the acts charged in the indictment." *State v. Ratliff*, 2d Dist. Montgomery No. 19684, 2003-Ohio-6905, ¶ 16.

{¶ 47} Viewed through this lens, we agree with the State's position that the statements in question cannot properly be described as impermissible propensity evidence. Wiedmaier's testimony on these points described the actions and deliberations undertaken in furtherance of the trio's plan to acquire money immediately precipitating the robbery of Wright. *See* Evid.R. 404(B). Moreover, the State did not endeavor to prove that Gray was attempting to engage in the sale of drugs on the day in question, nor did it actively seek to establish a link between Gray's prior stint in prison and the offenses at hand.

{¶ 48} Even if we were to find that Wiedmaier's reiteration of Gray's comment about prison were inadmissible or prejudicial, we note that the trial court sustained defense counsel's objection thereto and immediately instructed the jury to disregard the

comment. Curative instructions are generally viewed as sufficient to remedy the risk of undue prejudice. *See, e.g., State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 24; *State v. Wharton*, 4th Dist. Ross No. 09CA3132, 2010-Ohio-4775, ¶ 26-28. Juries are presumed to follow instructions. *See Jones*, 90 Ohio St.3d at 414, 739 N.E.2d 300. The granting of a mistrial on the basis of this fleeting, swiftly-remedied statement would have been disproportionate to any harm occasioned thereby. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 174-75.

**{¶ 49}** Moreover, even if the disputed statements were excised from the record, the remaining evidence against Gray was overwhelming. Our disposition of Gray's second assignment of error demonstrates as much. After scrutinizing the entire record, we are unpersuaded that the statements complained of herein occasioned material prejudice in a manner requiring reversal.

**{¶ 50}** Finding neither an abuse of discretion nor plain error in the trial court's denial of the motion for mistrial, Gray's first assignment of error is overruled.

## V.    Conclusion

**{¶ 51}** Having overruled Gray's three assignments of error, the judgment of the trial court is hereby affirmed.

. . . . . . . . . . . . .


TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

James D. Bennett
Byron K. Shaw
Hon. Jonathan P. Hein