[Cite as *State v. Jones*, 2020-Ohio-3852.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | | **CASE NO.  2019-L-056** |
| - vs - | : | |
| DARRELL JONES, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2018 CR 001140.

Judgment:  Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Alexandra E. Kutz* and *Teri R. Daniel,* Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH  44077 (For Plaintiff-Appellee).

*Cory R. Hinton,* Hanahan & Hinton, LLC, 8570 Mentor Ave., Mentor, OH  44060 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1}    Appellant, Darrell Jones, appeals from the judgment of the Lake County Court of Common Pleas, convicting him on one count of aggravated robbery, with a firearm specification, two counts of robbery, and one count of possessing criminal tools. At issue is whether the convictions are against the manifest weight of the evidence and whether the trial court abused its discretion in joining the offenses for a single trial.  We affirm the trial court.

{¶2} On the morning of July 24, 2018, an African-American male approached the front desk of the Quality Inn, located in the city of Wickliffe. The man was wearing a hat, sunglasses with "rainbow" tinted lenses, and had a napkin over his face. The man advised the clerk, Tempestt Varner, that he was robbing the business and he had a gun. Ms. Varner did not see a firearm but ran to the back office without surrendering any money. The man walked away from the counter towards the interior of the hotel. The incident was captured on video.

{¶3} On the morning of July 29, 2018, an African-American male approached the front desk of the same Quality Inn where a clerk, Jolante Jones, was working. The male approached from the inside of the hotel and had a bandana over his nose and mouth, was wearing a black jacket, a hat, and sunglasses with lenses tinted with "different colors." The male asked Mr. Jones for money and indicated he had a gun. Mr. Jones did not see a gun but gave the male the money and retreated to the back office. Mr. Jones stated he did not observe a firearm because the suspect's hands were in his pockets. He fled from the front desk, however, because of the threat. The male walked away from the desk toward the inside of the hotel. This incident was also captured on video.

{¶4} Finally, on the morning of August 2, 2018, an African-American male approached the front counter of a Sunoco Gas Station in Wickliffe, Ohio. The business was located adjacent to the Quality Inn that was the subject of the two previous incidents. The store's manager, Rachel Lauriel, stated the man was donning a hat, dark coat, sunglasses, and had a blue bandana over his mouth. As he approached Ms. Lauriel with hands in his pockets, he demanded "the F'ing money" while, at the same time, flashing a silver object in his pocket. Ms. Lauriel did not know what the object was

2

but believed it to be a gun. In response, Ms. Lauriel screamed and ran. The male then left the store, running in the direction of the Quality Inn. The incident was caught on surveillance video. The identity of the individual was unknown at this time; police, however, believed the three incidents were committed by the same individual.

{¶5} Upon leaving work for the day, Ms. Lauriel returned to her home, located down the street from the Sunoco station. The residence also abuts the fence line of the property on which the Quality Inn is located. After retrieving trash containers from the edge of the road, she noticed a blue bandana at the bottom of her yard-waste container. She believed it to be the bandana used in the robbery of the Sunoco store. Ms. Lauriel did not touch the item and notified the police of its discovery the next day, August 3, 2018. Police arrived at Ms. Lauriel's residence and an evidence technician retrieved the bandana; while on the property, police also found a black jacket and sunglasses at the edge of Ms. Lauriel's yard, where her property line meets that of the Quality Inn.

{¶6} The items found were submitted to the Lake County Crime Laboratory ("LCCL"). A DNA profile was obtained from the bandana, which was submitted by LCCL to the Combined DNA Index System ("CODIS"). CODIS returned appellant's name as a positive identification of the DNA from the bandana. Based on the similar behaviors of the male in each video, the locations of the crimes, witness' descriptions of the offender, and the DNA match, appellant was arrested and ultimately indicted on the following four counts: Count One, aggravated robbery (occurring on August 2, 2018), a felony of the first degree, in violation of R.C. 2911.01(A)(1), with a firearm specification, pursuant to R.C. 2941.145 and R.C. 2941.141; Count Two, Possessing Criminal Tools (for August 2, 2018 robbery), a felony of the fifth degree, in violation of R.C. 2923.24; and Counts Three and Four, robberies (occurring on July 29 and July 24, 2018,

3

respectively), in violation of R.C. 2911.02(A)(2), each with a firearm specification, in violation of R.C. 2941.141. Counts One and Two pertains to the robbery of the Sunoco gas station; Counts Three and Four pertains to the robberies committed at the Quality Inn.

{¶7} Appellant pleaded "not guilty" and the matter proceeded to jury trial. Appellant filed a motion for severance of counts for trial; the state opposed the motion and the trial court denied the same. After trial, appellant was found guilty of all four counts of the indictment and the R.C. 2941.145 firearm specification attached to Count One. He was found not guilty of the firearm specifications charged pursuant to R.C. 2941.141. Appellant was ultimately sentenced to serve terms of four years on Count One; 12 months on Count Two, three years on Count Three, and two years on Count Four. The terms for Counts One, Three, and Four were ordered to be served consecutively to each other, and the sentence for Count Two was ordered to run concurrent with these. Appellant was also ordered to serve a term of three years for the firearm specification, for a total term of 12 years.

{¶8} Appellant now appeals, assigning two errors. His first assignment of error provides:

{¶9} "The jury's finding of guilt and the defendant's subsequent conviction for Count One, aggravated robbery, Count Two, possession of criminal tools, Count Three, robbery, and Count Four, robbery, are contrary to the manifest weight of the evidence; therefore, Defendant's convictions for said counts should be overturned, and Defendant should be remanded to the trial court for a new trial on Counts One, Two, Three, and Four."

4

{¶10} A court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee,* 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *4 - *5 (Dec. 23, 1994).

{¶11} Appellant argues there was not substantial evidence upon which the jury could have reasonably concluded that all elements of each crime was proved beyond a reasonable doubt. He argues that none of the witnesses could identify appellant; there was little evidence that the bandana collected by police was the bandana used in the commission of two of the robberies; there is no way to know that the jacket was used in the robberies, and the evidence indicated that the jacket worn by the individual in the video was different than the jacket found on Ms. Lauriel's property. Finally, he asserts that although the bandana was charged as a criminal tool, the evidence indicated the pattern on the bandana was a common pattern.

{¶12} Appellant was convicted of one count of robbery, in violation of R.C. 2911.01(A)(1) and two counts of robbery, in violation of R.C. 2911.01(A)(2). Those subsections provide:

{¶13} (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶14} (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

{¶15} (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

5

{¶16} Appellant was also convicted of possessing criminal tools, in violation of R.C. 2923.24, which provides:

{¶17} No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally.

{¶18} Preliminarily, each victim/witness testified that the perpetrator of the three offenses had a remarkably similar appearance and a similar method of approaching them. Ms. Varner testified the individual who attempted to rob the Quality Inn on July 24, 2018 was an older African-American male, wearing a hat, rainbow, reflective sunglasses, and covered his mouth with a napkin. The man demanded money and stated he had a gun. After the exchange, Ms. Varner stated the man went back toward the inside of the hotel. And, when Ms. Varner reviewed the video from the second robbery which took place at the Quality Inn, she believed the same person committed both crimes.

{¶19} Mr. Jones testified that, on July 29, 2018, an older African-American male, wearing a baseball cap, multicolor sunglasses, and had a bandana around his mouth and nose area, approached him at the front desk of the Quality Inn. The man stated he was robbing the hotel and he had a gun. After the crime, the man retreated toward the inside of the hotel.

{¶20} Officer Nicholas Merrifield responded to the scene of the July 29 robbery. He was able to view the video surveillance from that robbery as well as the footage from the July 24 robbery. Officer Merrifield testified that the suspect in each was similar in build and had the same bowlegged "stance." He additionally pointed out that the suspect came from within the building and went back into the building after each

6

incident. In light of the foregoing, the officer testified that he believed the same person committed both robberies.

{¶21} Ms. Lauriel testified an African-American man wearing a hat, coat, sunglasses, and bandana over his mouth entered the Sunoco Station on August 2, 2018 and demanded money. She noted that the male flashed a silver object in his pocket that he began to lift but did not remove. Ms. Lauriel believed the object to be a gun. Ms. Lauriel, who lived a short distance from both the Sunoco station and the Quality Inn, found a bandana matching the bandana used in the robbery. When police arrived, they collected the bandana and additionally found a dark coat with reflective, colored sunglasses under it.

{¶22} The three witnesses testified that the perpetrator in each crime was dressed almost identically during the three robberies; used an object to shield his mouth and lower face as he made his demands; indicated he was in possession of a gun, but did not overtly utilize a firearm in any of the robberies; further, in the two Quality Inn robberies, the man hastened toward the interior of the hotel after the crimes. And after the Sunoco robbery, the man ran in the direction of the hotel, which also was in the direction of Ms. Lauriel's home, where the bandana, jacket, and sunglasses were found.

{¶23} Significantly, with respect the direction the man fled after each of the robberies, the jury heard testimony that appellant was staying at the Econo Lodge, which is physically connected to the Quality Inn, from July 16 through July 26, 2018. On July 26, 2018, appellant was removed from the Econo Lodge for failing to pay for his room; he subsequently stayed approximately six-tenths of a mile down the street from the Quality Inn/Econo Lodge at the Plaza Motel, from July 26, 2018 through August 2, 2018. This evidence demonstrated appellant was staying in the hotel complex where

and when the first robbery occurred and residing in a hotel less than one mile away from the second and third robberies when they occurred.

{¶24} Also, Dr. Karen Zaverella, DNA analyst and supervisor with the LCCL, extracted DNA profiles from both the bandana and jacket. The bandana yielded at least three DNA contributors and the jacket yielded a profile from a minimum of two contributors. The predominant profile from the primary contributor, the individual who most likely had direct physical contact with the bandana and jacket, was submitted to the CODIS database which returned appellant's name. A known sample was taken from appellant. Subsequently, Dr. Zavarella then performed a statistical analysis. With respect to the analysis, she explained:

> {¶25} [The] analysis [is] called a likelihood ratio and a likelihood ratio is pitting two different hypotheticals that [are] mutually exclusive. One hypothetical says that the suspect in question is the contributor, is a contributor to the evidence, the evidentiary profile. The alternative hypotheses would be that the suspect in question is not a contributor, it would be as opposed to a random individual from the population. As a result we get a statistic that would say, we would term it as so and so is let's say a million times more likely to be a contributor as to opposed to an unknown random individual. We consider in the laboratory a million times more likely to be a very strong statistic and that's where your reporting threshold is set to.

{¶26} After her analysis, Dr. Zavarella testified that the DNA mixture profile from the bandana was 562 trillion times more likely to consist of DNA from appellant and two unknown contributors, as opposed to three unknown contributors; and, the DNA mixture profile from the jacket was 190 trillion times more likely to consist of DNA from appellant and one unknown contributor, as opposed to two unknown contributors. Dr. Zavarella testified to the certainty of her analysis, stating her "numbers are absolutely accurate."

{¶27} Finally, the jury was able to view the video recordings of the robberies and compare the individual in the videos to appellant in the courtroom.

8

{¶28} Circumstantial evidence is accorded the same probative value as direct evidence. *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "Circumstantial evidence involves evidence not grounded on actual personal knowledge or observation of the facts in controversy, but of other facts from which inferences are drawn, showing indirectly the facts sought to be established." *State v. Skaggs*, 11th Dist. Lake No. 2015-L-024, 2016-Ohio-1160, ¶20 citing *State v. Nicely,* 39 Ohio St.3d 147, 150 (1988). An inference is "a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven." *State v. Nevius,* 147 Ohio St. 263 (1947). It therefore follows that when circumstantial evidence forms the basis of a conviction, that evidence must establish collateral facts and circumstances, from which the existence of primary facts may be rationally inferred according to common experience. *State v. Windle,* 11th Dist. Lake No. 2010-L-033, 2011-Ohio-4171, ¶25.

{¶29} We recognize there were no witnesses to directly identify appellant; still, the eyewitness testimony, the physical similarities of the perpetrator, the proximity of appellant's location (i.e., where he was residing) to the locations of the robberies, as well as the DNA evidence provided sufficient, credible circumstantial evidence to support the jury's verdict.

{¶30} Appellant's first assignment of error lacks merit.

{¶31} Appellant's second assignment of error provides:

{¶32} "The trial court failed to sever the trial of the appellant although three separate incidents of robberies were being alleged. The appellant should have been given the opportunity to have three separate trials."

{¶33} "Pursuant to Crim.R. 8(A), 'two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offense charged, whether felonies or misdemeanors or both, are of the same or similar character * * *.' Generally, joinder of offenses is liberally permitted in order to conserve judicial resources, prevent incongruous results in successive trials, or to diminish inconvenience to witnesses." *State v. Quinones,* 11th Dist. Lake No. 2003-L-015, 2005-Ohio-6576, ¶35, citing *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). The law generally favors joinder of multiple offenses in a single trial. *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991)

{¶34} Pursuant to Crim.R. 14, it may be necessary to separate trials to prevent prejudice. *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, ¶29. Crim.R. 14, provides, in relevant part: "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts * * *."

{¶35} "When a defendant claims that joinder is improper, he must affirmatively show that his rights have been prejudiced." *Quinones* at ¶38. "The accused must provide the trial court with sufficient information demonstrating that he would be deprived of the right to a fair trial if joinder is permitted." *Id.,* citing *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). "The state may negate the defendant's claim of prejudice by demonstrating either of the following: (1) that the evidence to be introduced relative to one offense would be admissible in the trial on the other, severed offense, pursuant to Evid.R. 404(B); or (2) that, regardless of the admissibility of such evidence, the evidence relating to each charge is simple and direct." *Quinones* at ¶39, citing *State v. Franklin*, 62 Ohio St.3d 118, 122 (1992).

10

{¶36} The standard for granting or denying separate trial is an abuse of discretion, which should be so exercised as to prevent injustice and secure the applicant of his right to a fair trial. *See, e.g., State v. Brunelle-Apley*, 11th Dist. Lake No. 2008-L-014, 2008-Ohio-6412, ¶108.

{¶37} Appellant argues his right to a fair trial was prejudiced because evidence from a stronger case was used to supplement and connect the stronger case to the weaker cases. In particular, evidence of the blue bandana and jacket, found subsequent to the August 2, 2018 incident, was exclusively used to establish guilt for the July 24, and 29, 2018 incidents. We do not agree.

{¶38} Pursuant to Evid.R. 404(B), other acts evidence may be admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "To be admissible to prove identity through a certain *modus operandi,* other-acts evidence must be related to and share common features with the crime in question." (Emphasis sic.) *State v. Lowe*, 69 Ohio St.3d 527 (1994), paragraph one of the syllabus.

{¶39} Here, the other acts evidence was admissible under Evid.R. 404(B) to establish appellant's identity as well as a common scheme or plan. All three robberies occurred within 10 days of one another, between July 24, 2018 and August 2, 2018. The sites of the three robberies, the Quality Inn and Sunoco gas station, essentially neighbor one another on Euclid Avenue in the city of Wickliffe. Appellant, at the time of the first robbery, was staying at the hotel that was robbed and, when the next two robberies occurred, he was residing at a hotel six- tenths of a mile from the other robbery locations. Finally, the perpetrator, in each of the crimes, had a common appearance and methodology; he approached witnesses wearing a hat, and sunglasses

11

with uniquely tinted lenses. And in two of the three robberies, he wore a coat – peculiar attire for the mid-summer months. He covered his mouth and lower face to disguise his facial features; in the first robbery, with a napkin and, in the second and third, a bandana. And, upon contacting the witnesses, he either threatened them with a gun or showed the witness that he possessed what appeared to be a gun.

{¶40} The Supreme Court of Ohio has validated the use of other acts evidence in order to establish identity. See, *e.g., State v. Coley*, 93 Ohio St.3d 253 (2001) ("other-acts" evidence of kidnapping, robbery, and other related crimes admissible in aggravated murder trial); *State v. Green*, 90 Ohio St.3d 352, 369 (2000) (same facts; Coley's accomplice, Joseph Green); *State v. Bey*, 85 Ohio St.3d 487, 490 (1999) (nearly identical facts between prior homicide to prove identity not an abuse of discretion); *State v. Woodard*, 68 Ohio St.3d 70, 73 (1993) (carjacking attempt to prove identity as to later carjacking and murder properly allowed); *State v. Jamison*, 49 Ohio St.3d 182, 183-187 (1990) (evidence of other similar robberies sufficiently probative to prove identity).

{¶41} In light of the common features of the crimes, we conclude the other-acts evidence was admissible to prove identity under Evid.R. 404(B). In this respect, appellant has failed to establish his rights were prejudiced by the joinder of offenses.

{¶42} Even if the other acts evidence would have been inadmissible, we further conclude the evidence of each offense is simple and direct. Evidence is "simple and direct" if the jury is readily capable of separating the proof required for each offense, if the evidence is not likely to confuse jurors, if the evidence is straightforward, and if there is little danger that the jury would improperly consider testimony regarding one offense as corroborative of the other. *See State v. Freeland,* 4th Dist. Ross No.

12

12CA003352, 2015-Ohio-3410, ¶14; *see also State v. Goodner*, 195 Ohio App.3d 636, 2011-Ohio-5018, ¶44 (2d Dist.)

{¶43} Each of the robberies involved different witnesses that independently testified to the facts of the crimes, which were of a similar character. The facts of each offense were uncomplicated and straightforward. And, under the circumstances of each incident, we discern no basis for the conclusion that the evidence of each, heard together, would confuse the jury or that the jury would improperly consider the testimony concerning one offense as corroborative of another offense. The evidence of the three crimes was therefore separate and distinct and did not prejudice appellant's rights. We accordingly hold the trial court did not abuse its discretion in joining the offenses for a single trial.

{¶44} Appellant's second assignment of error is without merit.

{¶45} For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is affirmed.


MARY JANE TRAPP, J., concurs,

THOMAS R. WRIGHT, J., concurs in judgment only.